**DERNICK RESOURCES, INC., Appellant,**

v.

**David WILSTEIN and Leonard Wilstein individually and as Trustee, Appellees.**

**David Wilstein and Leonard Wilstein individually and as Trustee, Appellants,**

v.

**Dernick Resources, Inc., Appellee.**

**No. 01–07–00491–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 31, 2009.

Rehearing Overruled March 18, 2010.

---

David B. McCall, Tom C. McCall, The McCall Firm, Kendall M. Gray, Andrews Kurth, LLP, Houston, TX, for Appellant.

Alan Brandt Daughtry, Kathrine M. Silver, Jackson Walker L.L.P., Jennifer Anne Powis, Baker Botts LLP, Houston, TX, for Appellee.

Panel consists of Justices KEYES, ALCALA, and HANKS.

## OPINION

EVELYN V. KEYES, Justice.

Appellants David and Leonard Wilstein (the "Wilsteins") were joint venturers with Dernick Resources, Inc. ("Dernick") under Joint Venture Agreements (JVA's) for a Nebraska gas field (the McCourt Field) and a Kansas oil and gas field (the Bradshaw Field). The Wilsteins appeal the portion of the trial court's judgment holding that the statute of limitations bars them from asserting claims against Dernick for (1) breach of a contractual right to be notified in writing of the opportunity to participate in acquiring the remaining portion of the working interest in the McCourt Field and (2) Dernick's sale of the Wilsteins' interest in the Bradshaw Field without notice to the Wilsteins.

In a cross-appeal against the Wilsteins, Dernick appeals the portion of the trial court's judgment awarding damages to the Wilsteins on their claims for fraud and/or breach of fiduciary duty for loss sustained by the Wilsteins as a result of a volumetric production payment (VPP)[1] placed on the McCourt Field by Dernick that sold the production from the field for a five-year period in exchange for a loan of cash to purchase the remaining portion of the

working interest. In four issues, Dernick argues that (1) legally insufficient evidence supports the award of damages in favor of the Wilsteins; (2) the trial court erred in holding that Dernick owed a fiduciary duty to the Wilsteins; (3) the Wilsteins' fraud non-disclosure recovery must be set aside because Dernick owed no duty of disclosure to the Wilsteins; and (4) the trial court erred in refusing to find that the Wilsteins' claims for loss due to the VPP were barred by limitations.

We reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. The McCourt Field Joint Venture

Harry Dernick was the founder of Dernick, an oil and gas exploration and production company, and a venturer with the Wilsteins in interests in oil and gas properties. Due to Harry Dernick's failing health, Stephen Dernick, Harry's son, took over the operation of Dernick.[2]

On August 30, 1991, the Wilsteins and Dernick entered into a joint venture agreement ("the JVA") whereby the Wilsteins agreed to advance money to Dernick to acquire working interests in oil and gas properties in Nebraska known as the McCourt Field and to conduct drilling and production operations on the leases ("the McCourt Field JVA"). Under the terms of the JVA, the Wilsteins and Dernick together owned 25% of the McCourt Field as tenants in common. The Wilsteins each owned a 5% undivided working interest[3] in

1. A volumetric production payment agreement is a common oil and gas financing device. *See EOG Res., Inc. v. Dep't of Revenue,* 86 P.3d 1280, 1282 (Wyo.2004).

2. Harry Dernick has since died.

3. A working interest is an interest in a mineral property that entitles the owner of the

interest to all or a share of the mineral production from the property; the working interest owner bears the costs of exploration, development, and operation of the property, and, in return, is entitled to a share of the mineral production from the property or of the proceeds therefrom. U.S. Energy Info. Admin., *Independent Statistics and Analysis Glossary,* http://www.eia.doe.gov/glossary/

the field, for a total interest of 10%, and Dernick owned a 15% working interest as tenants in common. The remaining 75% working interest in the field was owned by Snyder Oil Corporation (Snyder).

Each of the venturers had a proportionate undivided interest in the leases acquired and each was required to contribute his proportionate share of all costs in accordance with his percentage interest. Dernick undertook to pay and discharge out of the capital of the Venture all costs and expenses incurred in the acquisition and maintenance of the interest in the field and in drilling and completing wells, laying any pipelines, and constructing wells. The costs and expenses were then charged to the venturers in accordance with their percentages.

The JVA gave Dernick the full right and authority to negotiate for the acquisition of additional interests as the nominee of the venture and to execute all documents, including operating agreements, purchase and sale agreements, and other appropriate documents that it, in its discretion, deemed necessary or appropriate. The JVA also made Dernick the agent and attorney in fact for the venturers. Although the JVA expressly provided that the interest was owned by Dernick and the Wilsteins as tenants in common and the relationship of the venturers and Dernick was that of co-owners, *title* to the interest of the venturers was maintained in the name of Dernick, as nominee of the venture. Dernick was also given the right to enter a JOA on behalf of the venture and to act as operator.

The JVA provided that if a venturer encumbered, transferred, or otherwise disposed of his interest in the McCourt Field, the disposition must cover either (1) "the entire interest of the venturer" in the field or (2) "an equal undivided interest" in the field. The JVA further provided that if the interest of any venturer became "subject to any ... production payment or other charge over and above the Initial Lease Burdens ... such Venturer shall assume and alone bear all obligations with respect thereto and shall account for them to the owners thereof out of his share of the working-interest production from the [McCourt Field] properties" and that all such lease burdens "shall be subordinate to this Agreement and to any applicable Operating Agreement." All encumbrances and other dispositions made by any venturer were expressly made subject to the JVA, any applicable operating agreement, and any other agreement entered into pursuant to the JVA.

Snyder and Dernick executed the McCourt Field JOA on November 1, 1991. Snyder became the operator, and Dernick, as nominee and agent of the joint venture, was a non-operator, as were the Wilsteins, through Dernick. The JOA provided, in relevant part, that, if any party desired to sell all or part of its interest in the McCourt Field, "it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer." The other parties then had "an optional prior right," for fifteen days after receipt of the notice to purchase "on the same terms and conditions the interest which the other party proposes to sell." If the optional right were exercised, the JOA provided that "the purchasing parties shall share the purchased interests in the proportions that

glossary—w.htm (last visited Dec. 17, 2009); see also Geodyne Energy Income Prod. P'ship 1–E v. Newton Corp., 161 S.W.3d 482, 486 n. 10 (Tex.2005).

the interest of each bears to the total interest of all purchasing parties."

## B. The Purchase of Snyder's Interest in the McCourt Field: The Volumetric Production Payment

In 1996, Snyder decided to sell its 75% interest in the McCourt Field, and it honored the preferential right to purchase clause in the 1991 JOA by giving Dernick written notice of the right to purchase Snyder's interest for $3,056,000 in cash. Both the McCourt Field JVA and the 1991 JOA required written notice of the terms and conditions of the proposed sale to the other venturers when a party to the JOA desired to sell all of its interest in the McCourt Field. The JOA also provided that notice be given to all parties of any such offer "in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit 'A'." The notice was deemed given only when received by the party to whom the notice was directed, and the time for response ran from the date the originating notice was received. The McCourt Field JVA similarly provided that "all notices required or permitted to be given hereunder shall be personally delivered to the party to whom such notice is addressed" or mailed to the party by certified mail.

Although Dernick held title to the Wilsteins' interest in the field and was the nominee of the venture for making acquisitions on its behalf under the terms of the McCourt Field JVA, Dernick did not give the Wilsteins written notice of the opportunity to purchase Snyder's interest and of the terms of the offer as required by the McCourt Field JOA and JVA. Nor is there any evidence that Snyder directly notified the Wilsteins of the opportunity. However, Harry Dernick testified, and the trial court found, that he orally informed David Wilstein in October 1996 of the opportunity to purchase Snyder's interest and that Wilstein declined.

Dernick did not have enough funds to buy Snyder's interest for $3,056,000 in cash. Therefore, it considered other alternatives to obtain the capital to buy out Snyder. On or about December 13, 1996, Dernick bought Snyder's 75% interest in the McCourt Field by executing a VPP agreement with the Resource Fund, L.P.I.[4] Under the terms of the VPP agreement, Resource Fund advanced $3,200,000 to Dernick in return for the sale of 90% of the gas production from all of the undivided working interest in the McCourt Field to ResourceFund for a five-year period running from February 1, 1997 to January 31, 2002. To secure the obligation to repay the cash advance, ResourceFund took a mortgage on all the gas in the field and its above-ground facilities. After monthly production quotas were delivered to ResourceFund, the remaining 10% of the oil and gas in the McCourt Field could be sold for a profit.

Dernick used the $3,200,000 advanced by Resource Fund to buy out Snyder. To repay ResourceFund, Dernick committed 90% of its own, the Wilsteins', and Snyder's gas production to ResourceFund for five years. In January 1997, following the acquisition, Pathex Petroleum, Inc. ("Pa-

---

4. When an oil and gas transaction is financed with a VPP, "A producer sells its production for a limited duration in exchange for capital funds. The buyer receives a share of oil and gas produced for a limited time, free and clear of any of the costs of production, and its production payment interest is a real property interest of limited duration.... Generally, production payment transactions consist of three documents, namely, a purchase and sales agreement, a conveyance, and a production and delivery agreement." *EOG Res., Inc.*, 86 P.3d at 1282–83.

thex"), a wholly-owned subsidiary and alter ego of Dernick, became operator of the McCourt Field. Dernick did not inform the Wilsteins that it had bought Snyder's 75% interest in the McCourt Field and financed the transaction by burdening the field with a VPP secured by a lien on all the gas in the field and the above-ground facilities to purchase Snyder's interest. It simply began conveying 90% of the gas in the field to ResourceFund.

### C. The Purchase of Burciaga's Interest in Dernick and the Sale of Dernick's and the Wilsteins' Interest in the Bradshaw Field Joint Venture

In 1995, Gil Burciaga invested cash in Dernick in exchange for one-third of Dernick's shares. Burciaga also served on the Board of Directors for Dernick beginning in 1996. Burciaga separately owned Lakota Resources, Inc. ("Lakota").

After Dernick entered into the VPP with ResourceFund in 1996 to buy Snyder's 75% interest in the McCourt Field, Burciaga's relationship with Dernick deteriorated. To buy out Burciaga's interest in Dernick, Dernick attempted to sell some of its assets, including interest in a field known as the Sydney Field and the entire interest to which Dernick held title in the Bradshaw Field in Kansas.

As in the McCourt Field, Dernick and the Wilsteins were joint venturers in the Bradshaw Field. That venture was likewise formed to provide for the acquisition of oil and gas leases and to conduct drilling operations for the venturers' joint account. Dernick owned a 25% undivided working interest in the Bradshaw Field joint venture; each of the Wilsteins owned a 12½% undivided interest for a total interest of 25%; and Natural Gas Clearinghouse owned the other 50%.

The Bradshaw Field JVA, executed in 1994, was very similar to the McCourt Field JVA. Its capital was the undivided interest acquired in the leases and the funds contributed by the venturers in connection with acquiring leasehold interests, drilling wells, and conducting operations. Each venturer was required to contribute his proportionate share of all costs in accordance with his percentage interest. The JVA authorized Dernick to acquire interests in the leases and to make drilling commitments with respect to them. It also gave Dernick the full right and authority to negotiate for the acquisition or sale of interests as the nominee of the venture and to execute all documents, including operating agreements, drilling commitments, purchase and sale agreements, and other appropriate documents that Dernick, in its discretion, deemed necessary or appropriate.

As under the McCourt Field JVA, the venturers had an undivided interest in the leases and in all production of oil and gas, which they owned as tenants in common. Also as under the McCourt Field JVA, Dernick had the option to maintain record title to the interest of the venturers in the leases as the nominee of the venture, but the JVA expressly provided that the interest was owned as tenants in common and that the relationship of the venturers and Dernick was that of co-owners. All encumbrances, transfers, and other dispositions made by any venturer were expressly made subject to the JVA, any applicable operating agreement, and any other agreement entered into pursuant to the JVA. Finally, and again like the McCourt Field JVA, the Bradshaw Field JVA provided that "all notices required or permitted to be given hereunder shall be personally delivered to the party to whom such notice is addressed" or mailed to the party by certified mail.

On or about June 1, 1998, in order to obtain funds to buy Burciaga's stock in

Dernick, Dernick sold all of its "right, title, and interest" in the Bradshaw Field under a Purchase and Sale Agreement between itself and Bradshaw Energy, L.L.C. (the Bradshaw Field PSA). Because the Bradshaw Field JVA conferred on all venturers an undivided interest in the leases, and because Dernick was empowered to sell that interest as the nominee of the Wilsteins and held title to the Wilsteins' interest as their nominee, as well as its own, the sale of all of Dernick's "right, title, and interest" in the Bradshaw Field necessarily included the sale of the Wilsteins' interest in the field.

Dernick did not disclose to the Wilsteins its sale of their own and its interest in the Bradshaw Field in writing in accordance with the terms of the Bradshaw Field JVA. However, it did record the transaction in the Kansas land records on or about June 28, 1998.

## D. Dernick's Sale to Lakota of a Working Interest in the McCourt Field

Although Dernick sold all of the interests to which it held title in the Bradshaw Field, including the Wilsteins' interest, in addition to selling its interest in the Sydney Field, the funds generated from the sales were still not enough to buy out Burciaga's interest in Dernick. To acquire the rest of the capital needed to purchase Burciaga's stock in the company, Dernick entered into a Purchase and Sale Agreement (the "McCourt Field PSA") with Burciaga's company, Lakota, on July 1, 1998. The McCourt Field PSA granted Lakota a 19.360% "undivided interest" in Dernick's "rights, title and interest" in the McCourt Field, including its interest in the oil and gas wells and the production therefrom. Lakota's interest in the McCourt Field was expressly made subject to the VPP agreement with which Dernick had burdened the McCourt Field in order to obtain funds to buy out Snyder, and it was

made subject to Lakota's proportionate share of balances and amounts of gas owing and due to ResourceFund under the VPP agreement. There was, however, no joint venture agreement between Lakota and Dernick.

## E. Dernick's Repurchase of the VPP Burdening the McCourt Field and the 2000 Audit

On or about April 28, 2000, Dernick repurchased the VPP burdening the McCourt Field from ResourceFund. It did not inform either the Wilsteins, its cotenants and venture partners under the McCourt Field JVA and JOA, or Lakota, its cotenant under the McCourt Field JOA, that it had repurchased the VPP, which had been due to expire on January 31, 2002. After Dernick repurchased the VPP, paying off the mortgage it had placed on the McCourt Field, it was able to sell at higher prices the gas from the field that had formerly been committed to ResourceFund, but, as operator of the field, it continued to charge the non-operating working interest owners—Lakota and the Wilsteins—as if the VPP still burdened their interests. It did not offer Lakota or the Wilsteins the opportunity to pay off their shares of the VPP and to receive a higher price for their gas as well.

Between June and September, 2000, AMS Consultants conducted an audit of the McCourt Field on behalf of Lakota and the Wilsteins. As a result of the audit, which AMS provided to them on or about January 29, 2001, the Wilsteins discovered that Dernick had obtained the funds to buy out Snyder's working interest in the McCourt Field in December 1996 by burdening the production in the field with the VPP and that it had subsequently repurchased the VPP and sold the gas at a higher price without giving them the benefit of the repurchase. Instead, Dernick had continued to treat their interest as if it

were still burdened with the VPP. The trial court found that the Wilsteins discovered the existence of the VPP on or about January 29, 2001, when AMS provided them the results of the audit.

On June 20, 2002, Lakota filed suit against Dernick and Pathex, which had been the operator of the field since January 1997 as Dernick's subsidiary and assignee.

### F. The Second Audit and the Wilsteins' Assertion of Claims Against Dernick

In the course of a second audit in 2002, the Wilsteins discovered Dernick's June 1, 1998 sale of all of the interests in the Bradshaw Field to which Dernick held title, including their own.

In October 2003, the Wilsteins joined the litigation commenced by Lakota[5] and asserted claims against Dernick for breach of fiduciary duty and fraud in connection with Dernick's sale of their interest in the Bradshaw Field without notice, Dernick's acquisition of Snyder's interest in the McCourt Field by burdening the field with the VPP, and Dernick's repurchase of the VPP and resale of the gas for its own benefit. The Wilsteins claimed that they had not had notice of the sale of their working interest in the Bradshaw Field, that they had not been given the opportunity to participate in the acquisition of Snyder's interest in the McCourt Field financed with the VPP, and that they had not been notified of the repurchase of the VPP and offered the benefit of the same bargain as Dernick.

In addition to denying the Wilsteins' claims, Dernick filed affirmative defenses

claiming that their claims were barred by the statute of limitations. It claimed that the Wilsteins had constructive notice of the sale of their interest in the Bradshaw Field on June 1, 1998 because Dernick had recorded the sale in the Kansas land records on or about June 28, 1998. Dernick also claimed that it had notified the Wilsteins of the opportunity to purchase Snyder's interest in the McCourt Field by Stephen Dernick's telephoning David Wilstein and asking whether the brothers were interested in the acquisition in October 1996 and that the Wilsteins had elected not to participate in the acquisition. Therefore, according to Dernick, the four-year statute of limitations ran on both claims well before the Wilsteins filed their suit against Dernick in October, 2003.

### G. The Bench Trial and the Court's Findings of Fact and Conclusions of Law

The trial court held a two-week bench trial, after which it filed findings of fact and conclusions of law on October 13, 2005.

The court held that the Wilsteins had constructive notice of the sale of their interest in the Bradshaw Field when Dernick recorded the sale in the Kansas land records in June 1998, and therefore their claims with respect to the Bradshaw Field were barred by limitations. The court made the following pertinent findings of fact:

41. On or about December 1994, Dernick and the Wilstein Brothers entered into an Agreement to drill certain wells in the Bradshaw Field (the Bradshaw Leases).

5. Lakota was originally an appellant to this appeal. However, Lakota settled its claims with Pathex, Lakota's claims were severed from this case, the judgment between Lakota and Pathex was set aside without regard to the merits, and the severed case was remand-
ed to the trial court to effectuate their settlement. *Lakota Res., Inc. v. Pathex Petroleum, Inc. & Dernick Res., Inc.*, No. 01–09–00955–CV, 2009 WL 3931697 (Tex.App.-Houston [1st Dist.] Nov. 19, 2009, no pet. h.) (mem. op.).

. . . .

44. Dernick sold all its interests in the Bradshaw Field and the Bradshaw Leases on or about June 1, 1998, and recorded the transaction in the deed records in Kansas on or about June 28, 1998.

The court also made the following pertinent conclusions of law with respect to the Wilsteins' Bradshaw Field claims:

7. The ownership of oil and gas in the ground is a real property interest.

. . . .

15. The doctrine of constructive notice creates an irrebuttable presumption of actual notice of certain matters. It is applied when a person knows where to find the relevant information and had a duty to find that information, but failed to seek it out.

16. Real property records may constitute constructive notice of the information that one could gain by an examination of the public records.

. . . .

18. The existence of public records may not always constitute constructive notice, but it is sufficient to void a claim that such an injury is inherently undiscoverable.

19. The filing of the Bradshaw transaction in the deed records in Kansas is sufficient to start the running of the statute of limitations on claims relating to that transaction.

. . . .

22. There is insufficient evidence to establish fraudulent concealment by Dernick.

23. The statute of limitations on the Wilsteins' claims regarding the Bradshaw Field began to run on or about June 28, 1998.

With respect to Dernick's purchase of Snyder's interest in the McCourt Field through the VPP financing transaction and its early repurchase of the VPP, the trial court made the following pertinent findings of fact:

1. On or about November 21, 1991, certain parties, including David Wilstein and Leonard Wilstein (sometimes, collectively, the "Wilstein Brothers") and Dernick Resources, Inc. ("Dernick") entered into an Agreement ("JVA"), effective as of on or about August 30, 1991.

2. A signed copy of the JVA was not produced at trial; however, all parties agree that the draft JVA admitted at trial contains the operative terms of the JVA, and all parties agree to be bound by the terms of the draft JVA.

3. The acreage involved in the JVA was the Niobrara Properties in Nebraska (the Field).

4. The Wilstein Brothers forwarded money to Dernick to acquire property in the Field (the "Initial Interest in the JVA Field").

5. On or about November 1, 1991, Snyder Oil Corporation ("Snyder") and Dernick entered into an Agreement ("JOA").

. . . .

13. In or around 1995, Gil Burciaga ("Burciaga"), president of Lakota Resources, Inc. ("Lakota"), purchased a 1/3 interest in Dernick.

14. On or about October 2, 1996, Dernick received notice from Snyder of an offer to buy Snyder's Interest in the JOA Field and other facilities (the 1996 Snyder Acquisition).

. . . .

17. On or about December 13, 1996, Snyder assigned the 1996 Snyder Acquisition to Dernick.

18. On or about December 13, 1996, Dernick entered into a Volumetric Production Payment ("VPP") with ResourceFund, effective February 1, 1997, which burdened up to 90% of the net gas proceeds from the initial interest in the JVA Field plus the 1996 Snyder Acquisition (the total of these interests sometimes called "1997 Interests").

19. Notice was not given by Dernick to the Wilstein Brothers of the encumbrance of the 1997 Interests by the VPP.

20. The preponderance of credible evidence establishes that the Wilstein Brothers' Interest in the initial interest in the [McCourt] JVA Field ("Wilstein Initial Interest") was burdened by the VPP.

21. None of the proceeds from the VPP was allocated to the Wilstein Brothers or the Wilstein Initial Interest.

. . . .

30. Between on or about June 2000 and on or about September 4, 2000, AMS Consultants ("AMS") audited [Dernick] and the 1997 Interests on behalf of David Wilstein and Lakota.

31. On or about April 28, 2000, Dernick repurchased the VPP.

32. Dernick gave no written notice to Lakota or the Wilstein Brothers of the repurchase of the VPP.

33. Dernick continued to charge Lakota's Interest with its share of the VPP burden.

34. On or about January 29, 2001, AMS gave to Lakota and David Wilstein the audit of the 1997 Interests, which, among other things, gave them notice of the existence of the VPP.

35. The VPP expired on or about January 31, 2002.

With respect to the placing of the VPP on the McCourt Field and Dernick's repurchase of the VPP, the trial court made the following pertinent conclusions of law:

4. The terms of the [McCourt Field] JVA required Dernick to acquire property and execute documents as the nominee of the venture, or on its behalf, and to maintain record title as the nominee of the venture.

5. The terms of the [McCourt Field] JVA required property acquired thereunder, and all production of oil or gas therefrom, to be owned as tenants in common by the venturers.

6. When title to property is taken in the name of someone other than the person who advances the purchase price, a resulting trust is created in favor of the payor.

. . . .

14. Dernick's burdening the Initial Interest in the [McCourt] JVA Field, including the Wilstein Initial Interest, was a breach of the narrow fiduciary duties owed the Wilstein Brothers as the co-owners of the Initial Interest in the [McCourt] JVA Field.

. . . .

20. The filing of any records regarding the VPP transactions in Nebraska and/or Texas is not sufficient to start the running of the statute of limitations on claims against fiduciaries relating to those transactions.

. . . .

25. The statute of limitations on Lakota's and the Wilsteins' claims re-

garding the sale of the VPP to ResourceFund began to run on or after January 29, 2001.

26. Dernick did not have an obligation to notify either Lakota or the Wilstein Brothers of its election to repurchase the VPP from ResourceFund.

The trial court also held that the Wilsteins' claims that they were not allowed to participate in the 1996 acquisition of Snyder's interest in the McCourt Field were barred by limitations. The court made the following additional pertinent finding of fact with respect to the Snyder acquisition:

16. The preponderance of credible evidence establishes that, sometime in or around October 1996, Stephen Dernick telephoned David Wilstein and offered the Wilstein Brothers an opportunity to participate in the 1996 Snyder Acquisition, which opportunity was declined.

The court also made the following pertinent conclusion of law:

24. The statute of limitations on the Wilsteins' claims regarding the 1996 Snyder Acquisition began to run on or about October 1996.

The trial court then conducted a month-long jury trial on the remaining issues.

**H. The Jury Trial and the Trial Court's Final Judgment**

The jury trial began on May 10, 2006. On March 5, 2007, the trial court signed a modified final judgment. In accordance with the jury's findings, the trial court awarded the Wilsteins $287,400 for losses sustained as a result of the McCourt Field VPP, $13,226 for the difference between the amount that the Wilsteins received for their share of gas produced from the McCourt Field and the amount that the Wilsteins should have received, and $225,000 in attorney's fees.[6]

The trial court also ordered Dernick to pay David and Leonard Wilstein $250,000 each in exemplary damages. Although the jury found in favor of the Wilsteins on their conversion claim, the trial court granted Dernick's motion to disregard the jury's finding.

## II. The Wilsteins' Appeal

The Wilsteins raise two issues on appeal. First, they argue that the trial court erred in holding that a telephone call Stephen Dernick made to David Wilstein in October 1996 regarding the opportunity to purchase Snyder's interest in the McCourt Field for $3,056,000 constituted notice of the opportunity to participate in the Snyder Acquisition and that, therefore, the statute of limitations bars their claims with respect to the acquisition. Second, they argue that the trial court erred in holding that Dernick's recording of the sale of the interests to which it held title in the Bradshaw Field in the Kansas land records on June 28, 1998 constituted constructive notice of the sale of their interest in that field and that, therefore, the statute of limitations bars their claims with respect to the Bradshaw Field.

The Wilsteins contend that, as they were joint venturers with Dernick in both the McCourt Field and the Bradshaw Field, Dernick owed them a fiduciary duty of disclosure both with respect to the acquisition of Snyder's interest in the McCourt Field and with respect to the sale of their

---

6. The jury awarded the Wilsteins $287,400 for its breach of fiduciary duty claim and $320,000 on the fraud claim. The Wilsteins elected to recover for breach of fiduciary duty, which also allowed them to recover

$500,000 in exemplary damages. Dernick appeals these jury awards, but it does not appeal the Wilstein Brothers' award of $13,226 for the contractual pricing claim.

working interest in the Bradshaw Field. They contend that because Dernick breached its duty in both cases, the fraudulent concealment rule applies and tolls the running of the statute of limitations until their discovery of the breaches, which followed the audits of the McCourt and Bradshaw Fields that the Wilsteins sought. Therefore, the Wilsteins argue, their claims with respect to the denial of the opportunity to participate in the acquisition of Snyder's interest in the McCourt Field and with respect to Dernick's sale of their interest in the Bradshaw Field are not barred by limitations.

### A. Fiduciary Duty of Joint Venturer

The Wilsteins argue that the fraudulent concealment doctrine applies because the McCourt Field and Bradshaw Field JVA's imposed a fiduciary duty of disclosure on Dernick, which Dernick breached in both cases. Therefore, limitations was tolled until they discovered facts that put them on notice of Dernick's breach of its duty.

 Whether there is a fiduciary duty is a question of law for the court, not a fact question for the jury. *Taylor v. GWR Operating Co.,* 820 S.W.2d 908, 911 (Tex. App.-Houston [1st Dist.] 1991, writ denied). The facts that give rise to a fiduciary duty are, however, questions for the fact finder. *Id.* Thus, when, as here, the underlying facts are undisputed, the determination of the existence of a fiduciary duty is a question of law. *Meyer v. Cathey,* 167 S.W.3d 327, 330 (Tex.2005). Likewise, when the facts are undisputed, the question of whether a fiduciary duty has been breached is a question of law for the court. *Fuqua v. Taylor,* 683 S.W.2d 735, 738 (Tex.App.-Dallas 1984, writ ref'd n.r.e.).

 The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach. *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex.App.-Dallas 2006, pet. denied) (citing *Punts v. Wilson,* 137 S.W.3d 889, 891 (Tex.App.-Texarkana 2004, no pet.)). A fiduciary relationship imposes a duty on the fiduciary to render full and fair disclosure of facts material to the relationship giving rise to the duty. *Willis v. Maverick,* 760 S.W.2d 642, 645 & n. 2 (Tex.1988).

 Joint venturers for the development of a particular oil and gas lease have fiduciary duties to each other arising from the relationship of joint ownership of the mineral rights of the lease. *Rankin v. Naftalis,* 557 S.W.2d 940, 944 (Tex.1977); *Fuqua,* 683 S.W.2d at 738. Likewise, if there is a joint venture between the operating owner of an interest in oil and gas well drilling operations and the non-operating interest owners, the operating owner owes a fiduciary duty to the non-operating interest owners. *Taylor,* 820 S.W.2d at 909, 911–12. In addition, "[a]n appointment of an attorney-in-fact creates an agency relationship," and an agency creates a fiduciary relationship as a matter of law. *Tyler v. State,* 137 S.W.3d 261, 266 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (citing *Mathews v. Sun Oil Co.,* 425 S.W.2d 330, 337 (Tex.1968), and *Smith v. Lanier,* 998 S.W.2d 324, 334 (Tex.App.-Austin 1999, pet. denied)). The scope of the fiduciary duties raised by a joint venture relationship, however, does not extend beyond the development of the particular lease and activities related to that development. *Rankin,* 557 S.W.2d at 944–45.

 Here, Dernick and the Wilsteins were joint venture partners in both the McCourt Field and the Bradshaw Field. In addition, Dernick was the operating owner of both fields, and the Wilsteins

were non-operating interest owners. And, Dernick was appointed attorney-in-fact for the venturers in both JVAs. Therefore, we hold that Dernick owed a fiduciary duty of full and fair disclosure to the Wilsteins with respect to both joint ventures.

### B. Limitations and Fraudulent Concealment

The Wilsteins brought claims of fraud and breach of fiduciary duty against Dernick. Texas law prescribes a four-year statute of limitations for both. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a) (Vernon 2002).

"As a general rule, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex.2003). Thus, "[a] defendant who seeks summary judgment on the basis of limitations must conclusively prove when the plaintiff's cause of action accrued." *Seureau v. ExxonMobil Corp.,* 274 S.W.3d 206, 226 (Tex.App.-Houston [14th Dist.] 2008, no pet.). The date the cause of action accrues for purposes of limitations is a question of law. *Id.* In most circumstances, "a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Id.; Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990).

The fraudulent concealment doctrine, however, is an affirmative defense to limitations that resembles equitable estoppel. *Seureau,* 274 S.W.3d at 228. This doctrine estops a defendant from relying on limitations if he was under a duty to make a disclosure but fraudulently concealed the existence of a cause of action from the party to whom it belonged. *Id.* The accrual of a cause of action is deferred in a fraudulent concealment case until the plaintiff discovers or should have discovered the deceitful conduct or facts giving rise to the cause of action. *Earle v. Ratliff,* 998 S.W.2d 882, 888 (Tex.1999). The fraudulent concealment doctrine defers accrual because "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex.1996). For the doctrine to apply, however, the plaintiff must prove the defendant: (1) had actual knowledge of the wrong; (2) had a fixed purpose to conceal the wrong; and (3) did conceal the wrong from the plaintiff. *See Shah v. Moss,* 67 S.W.3d 836, 841 (Tex.2001). The fraudulent concealment doctrine does not bar limitations when the plaintiff discovers the wrong or could have discovered it through the exercise of reasonable diligence. *Kerlin v. Sauceda,* 263 S.W.3d 920, 925 (Tex.2008).

A breach of a fiduciary duty of disclosure is tantamount to concealment for limitations purposes. *Id.* at 645; *see Seureau,* 274 S.W.3d at 228 (including as additional element of fraudulent concealment doctrine "a duty to disclose the wrong"). Thus, the statute of limitations for a breach of fiduciary duty claim does not begin to run until the claimant "knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act." *Little v. Smith,* 943 S.W.2d 414, 420 (Tex.1997); *see also Willis,* 760 S.W.2d at 645 (accrual of cause of action of person to whom duty is owed is postponed until he discovers, or should discover, material facts in issue); *Seureau,* 274 S.W.3d at 228 ("The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances that would cause a reasonably prudent person to make inquiry which, if pursued, would lead

to the discovery of the concealed cause of action."). "When a failure to notify is the basis for a cause of action, a plaintiff knows or should have known of the failure to notify when it knows or should have known the facts about which it was to be notified," and the statute of limitations begins to run at that time. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998).

Because the Wilsteins and Dernick were joint venturers in both the McCourt Field and the Bradshaw Field, the fraudulent concealment doctrine applies in both cases. *See Willis*, 760 S.W.2d at 645 & n. 2; *Seureau*, 274 S.W.3d at 228. The questions, therefore, for limitations purposes are whether Dernick breached its duty of disclosure to the Wilsteins in both cases and, if so, when the Wilsteins learned of facts, conditions, or circumstances that would cause a reasonably prudent person to make inquiry that, if pursued, would lead to the discovery of the concealed cause of action for the breach. *See Seureau*, 274 S.W.3d at 228.[7]

### C. First Issue: The Wilsteins' Claims with Respect to the Snyder Acquisition

In their first issue, the Wilsteins state that they had a contractual right under the McCourt Field JVA to be notified in writing of the opportunity to participate in acquiring Snyder's interest in the McCourt Field. They contend that the trial court erred in starting the running of the statute of limitations when Stephen Dernick telephoned David Wilstein in October 1996 and offered the Wilsteins the opportunity to participate in the purchase of Snyder's 75% interest in the McCourt Field for $3,056,000 in cash, of which the Wilsteins would owe $1.6 to $1.7 million. The Wilsteins contend that the deal changed to require no up-front outlay of cash, that the "change in material terms triggered a new obligation to notify the Wilsteins," and that this second notice did not occur. The Wilsteins argue that "it was not until 2003 that the Wilsteins learned of Dernick's clandestine purchase" of Snyder's interest in the McCourt Field. Their counterclaim also asserted that they "were never made aware of the need to make an inquiry as to whether Dernick had acquired additional interests in the McCourt Field, and were never put on notice that these interests were acquired by Dernick." The Wilsteins contended they "did not know of and could not have discovered Dernick's non-compliance with the Joint Venture Agreement in the exercise of ordinary diligence." They contended that "Dernick acquired the Snyder interest without offering the Wilsteins the opportunity to participate in this acquisition as contractually required. Dernick breached its fiduciary and contractual duties to the Wilsteins by unilaterally ac-

---

7. In a post-submission brief, Dernick contends for the first time that the issue of its fiduciary duty with respect to the Bradshaw Field is not before the Court because the trial made no finding of fact with respect to such a duty. First, the Texas Rules of Appellate Procedure do not permit a party to raise new matters in a reply brief. *See* TEX.R.APP. P. 38.3 (providing that reply brief permits appellant to address "any matter in the appellee's brief."); *López v. Montemayor*, 131 S.W.3d 54, 61 (Tex.App.-San Antonio 2003, pet. denied). Were we to reach this argument, however, we would find it without merit, as the existence of a fiduciary duty arising from a joint venture agreement is a question of law, not fact, that was raised by the Wilsteins' appeal of the trial court's limitations rulings. *See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex.2005). Dernick also attempts, both pre—and post-submission, to argue the merits of the Wilsteins' claims for damages arising from Dernick's sale of their interest in the Bradshaw Field. These claims were not tried to the jury because of the trial court's limitations ruling and are not properly raised here. *See* TEX.R.APP. P. 33.1, 38.3.

quiring this interest without offering same to the Wilsteins." We agree with the Wilsteins.

We have held that Dernick owed the Wilsteins the fiduciary duties of a joint venturer. *See Rankin*, 557 S.W.2d at 944; *Fuqua*, 683 S.W.2d at 738. Thus, it owed them a duty of full and fair disclosure of facts that, if known, would reveal the existence of a cause of action. *See Willis*, 760 S.W.2d at 645 & n. 2 (holding that breach of duty of attorney to disclose facts material to representation is tantamount to fraudulent concealment); *Seureau*, 274 S.W.3d at 228 (holding that fraudulent concealment doctrine "estops a defendant from relying on the defense of limitations if the defendant was under a duty to make a disclosure but fraudulently concealed the existence of a cause of action from the party to whom it belongs"); *see also Courseview, Inc. v. Phillips Petroleum Co.*, 158 Tex. 397, 312 S.W.2d 197, 206 (1958) (holding that grantor's failure to discover fraud on part of oil company in obtaining conveyance of purchase rights or fact that it had acquired mineral property in which grantor had right of purchase was not due to want of diligence on part of grantor and was not barred by limitations where oil company had contractual obligation to give notice of purchases in designated area and grantor lacked knowledge of facts that would have aroused suspicions).

The 1991 McCourt Field JOA provided:

Should any party desire to sell all or any part of its interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase) the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of fifteen (15) business days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interests in the proportions that the interest of each bears to the total interest of all purchasing parties. . . .

Likewise, the McCourt Field JVA provided that "all notices required or permitted to be given hereunder shall be personally delivered to the party to whom such notice is addressed" or mailed to the party by certified mail. Both the JOA and the JVA thus expressly required *written* notice of a party's "desire to sell all or any part of its interests in the Contract Area," with "full information concerning its proposed sale" so that they might exercise their right "to purchase on the same terms and conditions the interest which the other party proposes to sell" in proportion to their interest in the field.

 Snyder notified Dernick of the proposed sale, and Dernick orally informed the Wilsteins of Snyder's desire to sell, but Dernick did not disclose, orally or in writing, the opportunity to purchase Snyder's interest by entering a VPP agreement with Resource Fund. Dernick simply committed their gas, along with its own, to Resource Fund in order to obtain cash to buy out Snyder. We hold, therefore, that Dernick breached the notice requirements of the JOA and JVA and, in doing so, breached its duty of full and fair disclosure to the Wilsteins. These actions gave rise to a concealed cause of action against Dernick for breach of fiduciary duty. *See Willis*, 760 S.W.2d at 645 & n. 2; *Seureau*, 274 S.W.3d at 228.

Our conclusion that Dernick's actions gave rise to a concealed cause of action for

breach of its fiduciary duty of disclosure is not changed by Dernick's argument in its cross-appeal. Specifically, Dernick argues that "the evidence conclusively established that no portion of the McCourt Field production applicable to the Wilsteins was taken to satisfy the VPP" and that because only 90% of the gas production from the McCourt Field was committed to the VPP and only 76% of the net production was actually taken by ResourceFund, while the Wilsteins owned only 10% of the working interest in the McCourt Field and 8.35% of the net production of the field, "the Wilsteins cannot demonstrate that any gas production to which they were entitled was diverted by the VPP."

It is undisputed that Dernick financed the purchase of Snyder's interest in the McCourt Field by encumbering the field with a VPP that obligated Dernick to commit 90% of the gas produced from the field for five years to ResourceFund, beginning February 1, 1997 and ending January 31, 2002, in exchange for $3,200,000 cash up front to pay Snyder. The trial court found that the VPP burdened "up to 90% of the net gas proceeds from the initial interest in the JVA Field plus the Snyder Acquisition," where the "initial interest" was the initial 25% undivided working interest in the McCourt Field acquired by the joint venture in 1991 from Snyder, and the total initial interests were those of Dernick, the Wilsteins, and Snyder, "sometimes called the '1997 Interests.'" The court also found that "the preponderance of the evidence established that "the Wilstein Brothers' Interest in the initial interest in the JVA Field ("Wilstein Initial Interest") was burdened by the VPP." Likewise, the court found that "[n]one of the proceeds from the VPP was allocated to the Wilstein Brothers or the Wilstein Initial Interests." The trial court's findings are supported by the record.

The McCourt Field JVA provided that if the interest of any venturer became "subject to any ... production payment or other charge over and above the Initial Lease Burdens," such lease burden "shall be subordinate to this Agreement and to any applicable Operating Agreement." Thus, the VPP agreement was subject to the provisions in the McCourt Field JVA and JOA.

The McCourt Field JVA provided that Dernick and the Wilsteins had a proportionate undivided interest in the leases acquired, that the interest was owned as tenants in common, and that the relationship of the venturers and Dernick was that of co-owners, although title to the interest of the venturers was maintained in the name of Dernick as nominee of the venture. The JVA gave Dernick the right and authority to negotiate for the acquisition of additional interests, such as Snyder's 75% interest in the McCourt Field, as the nominee of the venture and to execute all documents, including operating agreements, purchase and sale agreements, and other appropriate documents that it, in its discretion, deemed necessary or appropriate. The JVA made Dernick the agent and attorney in fact for the venturers, including the Wilsteins. Thus Dernick had the right to make acquisitions on behalf of the venture as its nominee and to hold title to the properties acquired in its own name. But the VPP did not thereby transfer ownership of the interests on whose behalf Dernick made acquisitions or entered other agreements. Rather, the JVA imposed on Dernick a fiduciary duty to disclose to his non-operating co-owners in the McCourt Field any and all negotiations and acquisitions, which we have held it breached.

The JVA gave Dernick the right to burden the McCourt Field with a VPP provided the VPP covered the "entire interest of

the venturer" in the field, which the ResourceFund VPP did not, or "an equal undivided interest" in the field, i.e., an equal undivided interest of all the venturers—here, an equal undivided 90% interest. The JVA further provided that if the interest of any venturer became "subject to any ... production payment or other charge over and above the Initial Lease Burdens ... such Venturer shall assume and alone bear all obligations with respect thereto and shall account for them to the owners thereof out of his share of the working-interest production from the [McCourt Field] properties." Here, Dernick burdened the entire undivided interest in the field with the VPP, and it did *not* bear the costs of the VPP itself; it charged their proportionate costs to the Wilsteins.

Despite the foregoing provisions in the JVA, Dernick, in its capacity as nominee of the *undivided working interest* in the McCourt Field that it represented and on whose behalf it acted, and as holder of title for the entire working interest under the terms of the JVA, represented in the VPP financing transaction documents that it was the sole "owner of the undivided interests" in the McCourt Field. It then exercised the powers given it by the JVA to be exercised on behalf of the undivided joint venture interests to sell "a mineral right and interest in real property," comprising 90% of the gas production of the McCourt Field, to ResourceFund for a term of five years in exchange for cash to buy out Snyder, and it granted ResourceFund a lien on 90% of the production from the field to ensure payment.

The VPP financing transaction consisted of three documents, as is typical of such a financing arrangement. *See EOG Res., Inc. v. Dep't of Revenue*, 86 P.3d 1280, 1282–83 (Wyo.2004). These were a purchase and sale agreement between Dernick and ResourceFund dated December 13, 1996, in which Dernick represented that it was "the owner of certain oil and gas leasehold interests in Cheyenne County, Nebraska" (Closing Agreement), that it had sold a production payment interest in the leasehold interests to ResourceFund, and that, "as full payment for the production payment," ResourceFund had paid Dernick $3,200,000. The statement that Dernick was the owner of all of the leasehold interests conveyed was false. It held title to the undivided leasehold interests of itself and the Wilsteins, as provided by the McCourt Field JVA, but it was a co-owner of the undivided working interest as a tenant in common with the Wilsteins.

Dernick, as "Seller," also executed a "Conveyance of Production Payment," which conveyed to ResourceFund, as "Buyer," "a mineral right and interest in real property consisting of a production payment (the "Production Payment") comprised of and representing 90% of the natural gas and other hydrocarbons ... in, under and which may be produced, saved and sold from, or which accrue or are attributable to, the Subject Interests" in the McCourt Field, effective February 1, 1997 and terminating January 31, 2002. In making this conveyance, Dernick represented that it was *"the owner of undivided interests* in certain oil and gas leases ... covering certain lands located in Cheyenne County, Nebraska (such undivided interests ... being herein referred to as the "Subject Interests.)" (emphasis added). The undivided interests, styled the "Subject Interests" in the Conveyance of Production Payment, 90% of whose production was sold to ResourceFund, were the same interests referenced by the trial court in its finding of fact number 18 as "the 1997 interests," namely, the total undivided working interest in the McCourt Field covered by the McCourt Field JVA, consisting of the interests of Dernick, the Wilsteins,

and Snyder.[8] Dernick's representation in the "Conveyance of Production Payment" that it was the owner of the undivided working interest in the leasehold interests in the McCourt Filed, like its representation of its ownership of the interests conveyed in the Closing Agreement, was false.

Finally, Dernick executed a Production and Delivery Agreement between itself and ResourceFund that governed the delivery of production payment gas to ResourceFund, granted ResourceFund a lien and security interest in "all of Seller's interest in the Subject Interests," and provided for the repurchase of the production payment from ResourceFund at "[a]ny time after July 31, 1998" on terms set out in paragraph 15 of the agreement. In other words, it granted ResourceFund a lien on 100% of the undivided interest in the McCourt Field.

Because the undivided working interest in the McCourt Field for which Dernick held title and acted as nominee included not only its own undivided interest but the undivided interest of its co-tenants—the Wilsteins—Dernick's claim that it did *not* include the Wilsteins' "mineral right and interest in real property" in its conveyance of 90% of the gas in the McCourt Field to ResourceFund in exchange for $3,200,000 cash to buy Snyder's interest in the field is contradicted by the conclusive evidence of the VPP transaction. Therefore, Dernick's argument that it did not commit the Wilsteins' gas to the VPP is without merit.

The trial court found that the Wilsteins did not have notice of the existence of the VPP transaction until January 29, 2001, when AMS gave them the audit of their interest in the McCourt Field. This finding is supported by the evidence. We conclude that the Wilsteins exercised reasonable diligence to discover their cause of action arising from the Snyder Acquisition by requesting the audit. *See HECI*, 982 S.W.2d at 886 (holding that when failure to notify forms basis of cause of action, plaintiff knows or should have known of failure to notify when it knows or should have known facts about which it was to be notified); *Seureau*, 274 S.W.3d at 228 ("The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances that would cause a reasonably prudent person to make inquiry which, if pursued, would lead to the discovery of the concealed cause of action."). The Wilsteins filed their breach of fiduciary duty claims in 2003, well within the four year statute of limitations for fraud and breach of fiduciary duty.

We hold that the Wilsteins' claims with respect to the Snyder Acquisition were not barred by the four-year statute of limitations.

We sustain the Wilsteins' first issue on appeal.

### D. Second Issue: The Wilsteins' Claims with Respect to the Bradshaw Field

8. There was also testimony from ResourceFund's landman, Mr. Prigge, that when he went to Dernick's office to establish ownership of the 25% of the working interest in the McCourt Field, none of the paperwork Dernick gave him disclosed the Wilsteins' interest. He was neither provided the joint venture agreement nor told there was a joint venture agreement. After being asked if there were any interest owners who had rights other than the record title owner, Dernick did not disclose the Wilsteins' interest. Rather, ResourceFund believed that Dernick was the sole owner of the property. He further testified that if Dernick had disclosed that ResourceFund was not dealing with one person, but also with the Wilsteins, that would have "change[d] the whole thing." Another ResourceFund witness, Mr. Goodman, also testified that Stephen Dernick represented that Dernick owned 25% already and was buying the other 75%.

In their second issue, the Wilsteins argue that the trial court erred in holding that their claims against Dernick with respect to the Bradshaw Field were barred by limitations. The Wilsteins argue that Dernick, their joint venturer under the Bradshaw Field JVA, breached its fiduciary duty to them by selling their portion of the working interest in the Bradshaw Field without disclosing the sale to them.

Dernick argues that the trial court correctly held that the Wilsteins' claims with respect to the Bradshaw Field were barred by limitations. Dernick contends, and the trial court found, that the sale, which occurred on June 1, 1998, was recorded in the Greeley County, Kansas land records on or about June 28, 1998. Therefore the Wilsteins were on constructive notice of the sale of their interest in the Bradshaw Field at that time, and the four-year statute of limitations ran before they filed their claims in October, 2003.

The Wilsteins respond that they did not have actual notice of the Bradshaw sale and that the recording statutes cannot impose constructive notice upon them. They claim that after they purchased their interest in the Bradshaw Field in 1994 they were not required to search for other conveyances of the property. They contend that they are entitled to "their percentage of the sales price attributable to any properties Dernick acquired subsequent to the creation of the Joint Venture, which the Wilsteins should have been offered and allowed to participate in." The Wilsteins contend that "Dernick's failure to properly account for the assets of the Joint Venture ... and its failure to disclose the sale of the properties, both constitute a breach of its fiduciary duties, and a breach of the terms of the [Bradshaw Field JVA]. . . ." Again, we agree with the Wilsteins.

Like the McCourt Field joint venture, the Bradshaw Field joint venture was formed to provide for the acquisition of oil and gas leases, this time in Kansas, and the conduct of drilling operations for the venturers' joint account. Dernick owned a 25% working interest in the Bradshaw Field joint venture, each of the Wilsteins owned a 12½% interest, for a total interest of 25%, and Natural Gas Clearinghouse owned the other 50%. As in the McCourt Field joint venture, the Bradshaw Field venturers all had an undivided interest in the leases and in all production of oil and gas, which they owned as tenants in common, and the Bradshaw Field JVA gave Dernick the full right and authority to negotiate for the acquisition or sale of interests as the nominee of the venture and to execute all documents, including purchase and sale agreements, that Dernick, in its discretion, deemed necessary or appropriate. Dernick also had the option to maintain record title to the interest of the venturers in the leases as the nominee of the venture, but the JVA expressly stated that the interest was owned as tenants in common and that the relationship of the venturers and Dernick was that of co-owners. Finally, the JVA provided that "all notices required or permitted to be given hereunder shall be personally delivered to the party to whom such notice is addressed" or mailed to the party by certified mail.

We hold that, just as with respect to the McCourt Field joint venture, Dernick had a fiduciary duty as joint venturer and operator of the Bradshaw Field to notify the Wilsteins of the sale of their interest in the Bradshaw Field, which it undertook as their nominee, and to account to them for that interest. It is undisputed that it did neither. Therefore, it breached its fiduciary duty. Its breach of its fiduciary duty of disclosure was tantamount to fraudulent concealment for limitations purposes. *See*

*Willis,* 760 S.W.2d at 645 (holding that breach of fiduciary duty of disclosure is tantamount to concealment for limitations purposes).

■■■ Contrary to the trial court's finding, the Wilsteins were not under any legal duty to examine the deed records of Greeley County, Kansas to ascertain whether Dernick had breached its fiduciary duties or had breached the JVA agreement. In *HECI,* the Texas Supreme Court discussed the relationship between the doctrine of constructive notice, the discovery rule, and, tangentially, the fraudulent concealment rule. The court rejected the defendant's argument that the plaintiff had constructive notice of public records kept by the Railroad Commission. *See HECI,* 982 S.W.2d at 886–87. The court observed that the constructive notice doctrine applies only in limited circumstances, including suits to try title and probate proceedings. *See id.* Thus, while it recognized that certain public records kept by the Railroad Commission were "a ready source of information, and a cause of action for failure to provide that same information [was] not inherently undiscoverable," it held that those records did not provide constructive notice to the plaintiff as a matter of law. *See id.* at 887. Moreover, the court stated that "if an operator fraudulently concealed information from a lessee, decisions of this and other courts indicate that limitations may be tolled." *Id.* at 886 (citing *S.V.,* 933 S.W.2d at 6, for decisions regarding fraudulent concealment).

Similarly, in *Ojeda de Toca v. Wise,* the Texas Supreme Court addressed the question of whether fraud and DTPA claims were barred as a matter of law because the defendants' alleged deception would have been discovered from an examination of the county records. 748 S.W.2d 449, 450 (Tex.1988). The court concluded that recording statutes such as Texas Property Code section 13.002 serve a distinct purpose: to protect a good faith purchaser "against the evils of secret grants and secret liens." *Id.* at 450–51 (quoting 66 AM.JUR.2D *Records and Recording Laws* § 48 (1973)); *see also Boucher v. Wallis,* 236 S.W.2d 519, 526 (Tex.Civ.App.-Eastland 1951, writ ref'd n.r.e.) ("The purpose of recording laws is to notify *subsequent purchasers* of the rights such instruments intended to convey and not to give protection to perpetrators of fraud.") (emphasis added). As *Ojeda de Toca* notes, deed records by statute afford notice of interests conveyed in real property to protect those interests and *subsequent grantees,* not to protect perpetrators of fraud. 748 S.W.2d at 450–51. Here, the Wilsteins were not subsequent grantees or subsequent purchasers but joint venturers with Dernick and co-owners of the property Dernick secretly sold in breach of its fiduciary duties under the Bradshaw Field JVA. Therefore the filing of the sale in the deed records did not constitute constructive notice to the Wilsteins. *See HECI,* 982 S.W.2d at 887.

We conclude that Dernick breached its fiduciary duty to the Wilsteins by failing to disclose its sale of their interest in the Bradshaw Field and that the Wilsteins were not put on constructive notice of the sale by the filing of the sale in the Kansas public records. The trial court found that the Wilsteins discovered the sale of their interest in the Bradshaw Field following the 2002 audit of that field. This finding is supported by the evidence. Because the Wilsteins filed their Bradshaw Field claims in 2003, their claims were not barred by the four-year statute of limitations for breach of fiduciary duty and fraud.

We sustain the Wilsteins' second issue on appeal.

## III. DERNICK'S CROSS-APPEAL AGAINST THE WILSTEINS

In its first issue on cross-appeal, Dernick argues that legally insufficient evidence supports the jury's award of damages in favor of the Wilsteins for losses due to the VPP. In its second and third issues, Dernick argues that the trial court erred in holding that Dernick owed a fiduciary duty to the Wilsteins and in awarding them a "fraud non-disclosure recovery." In its fourth issue, Dernick argues that the trial court erred in refusing to find the Wilsteins' claims for losses attributable to the VPP barred by limitations. Because our disposition of the Wilsteins' appeal is dispositive of Dernick's issues, we do not address Dernick's cross-appeal separately.

### Conclusion

We reverse the judgment of the trial court on the Wilsteins' claims and remand the case for further proceedings consistent with this opinion.