**Opinion issued March 13, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-13-00068-CV

_____

**CAPCOR AT KIRBYMAIN, L.L.C., Appellant**

**V.**

**MOODY NATIONAL KIRBY HOUSTON S, L.L.C. D/B/A MOODY NATIONAL KIRBY HOUSTON, L.L.P. AND MOODY NATIONAL TITLE COMPANY, L.P., Appellees**

---

On Appeal from the 215th District Court
Harris County, Texas
Trial Court Case No. 2011-32904

---

## O P I N I O N

This appeal concerns the fiduciary responsibilities of a title insurer as escrow agent for a commercial real estate transaction. Appellant Capcor at KirbyMain, L.L.C., argues that the escrow agent—appellee Moody National Title Company,

L.P.—breached its fiduciary duties by refusing to accept a cashier's check to close Capcor's purchase of a tract of unimproved land. Capcor also contends that the trial court erred in refusing a requested jury instruction on material breach of contract by the seller, appellee Moody National Kirby Houston, L.L.P.

Finding no reversible error, we affirm.

## Background

Moody National Kirby Houston, L.L.P. (Moody Kirby) owned a vacant lot near the Texas Medical Center. Moody Kirby had fallen behind on its loan payments, and its bank agreed to forgive a substantial portion of the principal in exchange for the proceeds of a sale. Capcor agreed to purchase the land from Moody Kirby using a standard "Unimproved Property Contract" promulgated by the Texas Real Estate Commission. The contract specified a definite date for closing and provided that "At closing . . . Buyer shall pay the Sales Price in good funds acceptable to the escrow agent." If a party failed to close the sale by the closing date, the other party was entitled to exercise its contractual remedies, which included terminating the contract and receiving the earnest money as liquidated damages.

The parties agreed to use Moody National Title Company, L.P. (Moody Title), a company wholly owned by Moody Kirby's sole owner, Brett Moody, as

2

title company. Pursuant to the contract, Capcor deposited $25,000 in earnest money with Moody Title.

As the last day for closing under the contract was the Sunday of Memorial Day weekend, the parties agreed to shift the date for closing to the following Tuesday. The day prior to closing, Moody Title escrow agent Kay Street informed Capcor's lawyer that Moody Title needed to receive the purchase funds in the form of a wire transfer. She informed Capcor's principal, Josh Aruh, of the same requirement when he arrived at Moody Title's office the next morning to sign closing documents.

That afternoon, Street became concerned. Although the portion of the purchase price Capcor was borrowing from its bank had arrived by wire transfer, she had not received a wire for the additional amount that Capcor was paying itself. She sent an email to Aruh stating: "Please advise once the wire has been sent. We need to fund today and our outgoing wire cutoff is 3:30." She also spoke on the phone with Capcor's attorney, who called and asked if she had received the wire. When she replied that she had not received it, he said, "Let me see what's going on." She still had not received a wire at 3:05 when she sent another email to Aruh: "The purchaser funds are still outstanding. Please be advised that this transaction is not closed until all funds are received."

3

At 4:26, Street received an email from Capcor's bank informing her that a Capcor principal was on his way to the bank to obtain a cashier's check. This is the first communication to Street clearly established in the record that Capcor intended to use a cashier's check, and no evidence was presented to affirmatively establish that Capcor had provided such notice to Street at any time prior to that. Street reacted by contacting her underwriter, Fidelity National Title, to ask whether she could accept the cashier's check. Fidelity had sent a bulletin to its agents cautioning them about counterfeit cashier's checks. Street eventually spoke to two Fidelity representatives who both informed her that she could not accept a cashier's check.

Street next sent an email to Capcor's bank, which stated: "They need to be stopped. We cannot accept a cashier's check for that amount it has to be a wire." She sent a further email to the bank, copying it to Capcor's attorney: "Underwriting will not allow a cashiers check for that amount. It needs to be a wire." About this time, she also called the Texas Department of Insurance, which informed her that as long as she did not accept types of funds prohibited by its regulations, Moody Title was free to set its own policies as to what funds it would accept.

Sometime after 5:00, Capcor principal Avi Ron arrived at Moody Title with a cashier's check. When Street told Ron that she was leaving for the day and could

4

not accept the check, he threw it on her desk. At this point it was no longer possible for Capcor's bank to conduct a wire transfer.

Street later testified as to her reasons for refusing to accept the cashier's check. Not only had Fidelity's representatives told her not to accept the check, but she avowed that she had had "an absolute responsibility to follow the directive of the underwriting counsel" at Fidelity. Violating this responsibility, she believed, would have resulted in loss of her escrow officer's license.

Aside from the limitations imposed by her underwriter, Street had been directed by Capcor's bank not to disburse its funds unless she was in a position to issue a title policy. And Street could not issue a title policy until consideration had passed. As she expressed the limitation, "[A]ny transaction that's on the last day of the contract has got to close and fund that day. And it's not closed till it's funded. And I'm in a position to issue a title policy." When asked what type of funds were needed, Street responded, "Collected funds, a wire."

Street clarified that cashier's checks are not considered "collected funds" because they are subject to a three-day recall. She also explained that because she would not have been able to deposit the check until the next day, the funds were not available for transfer on the day of closing. Simply "floating" the money, i.e., using Moody Title's own funds to complete the transaction on behalf of the buyer while awaiting fulfillment of the cashier's check, was not possible due to Moody

5

Title's limited resources and the need to strictly separate sums in trust accounts from an escrow agent's own assets.

The morning after the failed closing, Capcor's attorney offered to immediately substitute a wire transfer for the cashier's check. Moody National, however, sent notice that it was terminating the contract.

Capcor refused to sign a release of the earnest money, and it sued Moody Kirby on the sales contract, later adding claims against Moody Title for tortious interference with the contract and breach of fiduciary duty. Moody Kirby counterclaimed, seeking the earnest money and contractual liquidated damages. When the case was tried, the jury found that Capcor had breached the contract, while Moody Kirby had not. The jury further found that Moody Title had not breached its fiduciary duties to Capcor.

The trial court entered judgment awarding Moody Kirby's attorney's fees, the escrowed funds, and contractual liquidated damages in an amount three times greater than the earnest money. After its motions for JNOV and new trial were overruled by operation of law, Capcor timely appealed.

**Analysis**

Capcor argues that the evidence was factually insufficient to support the jury's verdict that Moody Title did not breach its fiduciary duties. It contends that the great weight and preponderance of the evidence showed that Moody Title, as

represented by Street, breached its fiduciary duties by failing to disclose material facts concerning the applicable policies regarding cashier's checks and by imposing a requirement that funds be provided by wire transfer. It similarly claims that the great weight and preponderance of the evidence demonstrated that Moody Title tortiously interfered with the contract. Separately, Capcor also argues that the trial court erred in refusing to submit an instruction on material breach of the contract.

## I.     Fiduciary duty claim against Moody Title

"When a party attacks the factual sufficiency of an adverse finding on an issue on which [it] has the burden of proof, [it] must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). A "court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* The jury is the sole of judge of witnesses' credibility and may give credence to one witness rather than another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). As it is the jurors' role to resolve conflicts in the evidence, our review assumes that they did so in a manner consistent with their verdict. *Id.* at 820.

An escrow agent acts as a neutral party to the transaction and owes a fiduciary duty to both parties. *Gonzales v. Am. Title Co. of Hous.*, 104 S.W.3d 588, 598 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "This fiduciary duty consists of: (1) the duty of loyalty; (2) the duty to make full disclosure; and (3) the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it." *Trevino v. Brookhill Capital Res., Inc.*, 782 S.W.2d 279, 281 (Tex. App.—Houston [1st Dist.] 1989, writ denied). An escrow agent must "act with utmost good faith and avoid self-dealing that places its interest in conflict with its obligations to the beneficiaries." *Gonzales*, 104 S.W.3d at 598.

"The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach." *Dernick Res., Inc. v. Wilstein*, 312 S.W.3d 864, 877 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).

A. **Duty of disclosure**

Capcor argues that the great weight and preponderance of the evidence showed that Moody Title breached its fiduciary duties by failing to timely disclose that it would not accept a cashier's check at closing. It further contends that if the

8

reason Street rejected the cashier's check was that her underwriter would not allow her to accept it, then she had a duty to disclose the policies of her underwriter regarding cashier's checks.

"A fiduciary relationship imposes a duty on the fiduciary to render full and fair disclosure of facts material to the relationship giving rise to the duty." *Wilstein*, 312 S.W.3d at 877. "A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question." *Fleming v. Curry*, 412 S.W.3d 723, 736 (Tex. App.—Houston [14th Dist.] 2013, pet. filed) (applying definition to alleged breach of fiduciary duty by attorney); *see also Custom Leasing, Inc. v. Tex. Bank & Trust Co. of Dall.*, 516 S.W.2d 138, 142 (Tex. 1974) (outlining same definition of "material" in context of fraud). "Materiality thus centers on whether a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Fleming*, 412 S.W.3d at 737. Which facts are material to a transaction will vary with circumstances—a fact that is pertinent in one context may be inapposite in another—and absent a legal rule to the contrary, materiality is an issue of fact for the jury.[*] *See id.* (holding that whether attorney complied with

---

[*] After it filed its brief in this case, Capcor retained new counsel. Its new counsel filed a letter brief the day before oral argument contending that Moody Title had breached its fiduciary duty of full disclosure *as a matter of law*. We granted a motion to strike the letter. Regardless of whether this line of argument was fairly subsumed within the factual sufficiency arguments presented in its original brief,

fiduciary duty to disclose all material information was question of fact); *Santanna Natural Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 892 (Tex. App.— Austin 1997, pet. denied) ("Determining what a reasonable person would have done or should have known are normally questions of fact."). As explained below, we conclude that the jury heard evidence from which a reasonable factfinder could have concluded that the facts Capcor claims Moody Title should have disclosed were not material to the transaction.

Street testified that she informed Capcor's lawyer the day before closing that a wire would be required for payment and that she imparted the same information to Capcor's principal, Aruh, on the morning of closing. Although Capcor argues that there is no documentary evidence to support Street's claim and that she sometimes spoke of wiring "instructions" rather than a wiring requirement, nonetheless the jury could have reasonably credited her testimony: "I know I did tell him [Capcor's attorney] that we had to have a wire;" and "I absolutely most definitely told him [Aruh] I had to have a wire at the closing table."

Street and Brett Moody testified, based on their long experience in the title and real estate businesses, about the customary expectations and assumptions of

Capcor has provided us no authority, at oral argument or otherwise, that an escrow agent is required to make the disclosures at issue as a matter of law. Thus, whether or not Capcor's argument that Moody Title breached its fiduciary duties as a matter of law is properly before us, for the reasons explained above and in the absence of contrary authority, we decline to hold that the escrow agent in this case was so obligated as a matter of law.

10

parties to a commercial real estate transaction of this type. Moody testified that he had participated in "a thousand deals," yet he had never seen a cashier's check used in a commercial closing. He added that cashier's checks are not used in this context because of the delay associated with their deposit and collection. According to him, the lull in the availability of funds conveyed by cashier's check prevents a title company from immediately delivering the purchase price to the seller, a precondition to the title company releasing the seller's deed to the purchaser.

When Street was cross-examined as to whether it was "important" for her to inform her clients of her underwriter's policies regarding cashier's checks, she explained, "Just for the sake of talking about it? No. Whenever a wire is expected, no." Later in the same colloquy, she similarly stated, "And no, I wouldn't find it necessary to inform the buyer of that unless that came up . . . ." In this regard, the parties do not contend, and we have found no record evidence to suggest that the possibility of using a cashier's check was brought to Street's attention by the parties prior to the email Street received from Capcor's Bank at 4:26 PM on the day of closing. Street's testimony that it would not be important to inform a buyer about the acceptability of a cashier's check is congruent with the testimony of Brett Moody on the rarity of cashier's checks in commercial real estate transactions

Considering this evidence, we do not agree with Capcor that the jury's finding that Moody Title complied with its duty of full disclosure is against the great weight and preponderance of the evidence. Regardless of whether the evidence showed that Street rejected the check solely because of her underwriter's policies, the testimony of Street and Moody would have permitted a reasonable jury to find that disclosure of policies on cashier's checks was immaterial to the transaction because their use would not be ordinarily contemplated in transactions of this kind and there had been no indication a party would attempt to use one until late in the afternoon on the day of closing. Alternatively, a reasonable jury could have concluded that Street fulfilled her duties by informing Capcor on the day before closing, and again on the day of closing, that a wire was required.

In other words, the jury reasonably could have inferred from Street's and Moody's testimony that cashier's checks were so rarely used in commercial real estate transactions, and wire transfers so commonly used, that whether Moody Title would accept them was not a material fact. The jury also could have reasonably concluded that telling Capcor that a wire was required on the day before closing was adequate and timely disclosure, especially in light of the testimony tending to show that a wire transfer would have been the expected form of payment. Although Capcor argues that Moody Title did not make "timely disclosure," it offers no reasons why informing Capcor of the wire requirement on

12

the day before or the morning of closing would have afforded inadequate time to act on the information.

As a sub-argument, Capcor contends that Moody Title at least should have informed it of the conditions under which its underwriter would have accepted a cashier's check once it became apparent on the afternoon of closing that use of a cashier's check was intended. Capcor points to testimony that the underwriter would have been willing to accept a properly verified cashier's check and argues that Street, in her testimony, acknowledged that whether she would accept a cashier's check hinged on the directives of her underwriter. However, there was other evidence that delivery of a cashier's check, even in a form acceptable to the underwriter, still would have been futile for the purposes of completing the closing that day. Both Street and Moody testified that collected funds—that is, funds available for immediate disbursement—were needed to close the transaction on the last day of closing, that cashier's checks were subject to a three-day hold, and that at the late hour when Capcor's principal arrived with the cashier's check it was impossible to deposit the check. As such, the evidence was factually sufficient to support the jury's implied finding that the conditions under which the underwriter would accept a cashier's check also were not facts material to the transaction during the late afternoon on the closing date.

Capcor emphasizes testimony of Street to the supposed effect that the underwriter's policies were the sole reason she rejected the cashier's check. For example, Street testified, "I was not consummating the transaction because underwriting forbade me to accept the cashier's check," and "It wasn't my decision not to accept. It was Fidelity National Title's, the underwriter." Street's denial that she had a choice to accept the cashier's check did not render it unreasonable for the jury to believe her other explanations as to why she could not have accepted a cashier's check, verified or otherwise, at the time Capcor indicated its intention to use one. Having heard Street's testimony as a whole, the jury reasonably could have disagreed with Capcor's view of the evidence that Street's sole reason for refusing to accept the check was her underwriter's policies. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) ("In reviewing a factual sufficiency point, the court of appeals must weigh *all* of the evidence in the record.").

Accordingly, Capcor's claim that the evidence was factually insufficient to support the jury's finding that Moody Title complied with its fiduciary duty of full disclosure of material information is overruled.

## B.     Requirement of wired funds

Capcor argues that even if Moody Title did not breach its fiduciary duties by failing to disclose its policies (or its underwriter's policies) respecting cashier's checks, requiring wired funds was itself a breach of fiduciary duty and constituted

14

tortious interference with the contract. It claims that the jury's finding to the contrary was against the great weight and preponderance of the evidence.

A tortious interference claim has four elements: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).

The sales contract stated, "Buyer shall pay the Sales Price in good funds acceptable to the escrow agent." Capcor argues that the definition of "good funds" contained in Rule P-27 of the *Basic Manual of Rules, Rates, and Forms for the Writing of Title Insurance in the State of Texas*, a set of regulations promulgated by the Texas Department of Insurance, required that Moody Title accept a cashier's check as good funds. *See* 28 TEX. ADMIN. CODE § 9.1 (2013) (Tex. Dep't of Ins., Basic Manual of Rules, Rates, and Forms for the Writing of Title Insurance in the State of Texas) (adopting manual by reference). We disagree.

Rule P-27 is titled, "Disbursement From Escrow or Trust Fund Accounts." Basic Manual of Rules, Rates and Forms for the Writing of Title Insurance in the State of Texas § IV, P-27. Among other forms of payment, it lists cashier's checks as a form of "good funds." *Id.* § IV, P-27(A)(1)(b). It does not, however, require that a title insurer accept all enumerated types of good funds. *See id.* § IV, P-27. Rather, the Rule prohibits a title insurer from disbursing funds until "good funds"

15

are received and deposited: "Good funds in an amount equal to all disbursements must be received and deposited before any disbursement may be made." *Id.* § IV, P-27(B)(1). Nothing in the Rule limits a title insurer's authority to refuse particular forms of payment that qualify as good funds, *see id.* § IV, P-27; there is only a prohibition on disbursements before good funds have been received and deposited. *See id.* § IV, P-27(B)(1). The Rule's narrow effect is consistent with the statute that it implements, which is a simple prohibition on disbursements from trust accounts until sufficient good funds have been received and deposited to fund the disbursements. *See* TEX. INS. CODE. ANN. § 2651.202 (West 2009).

The sales contract vested Moody Title with discretion to determine which good funds it would accept: "Buyer shall pay the Sales Price in good funds acceptable to the escrow agent." *See generally Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 652 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ("It is well established that a contract may require performance by one party to be subject to the satisfaction of . . . a designated thirty party . . . . Generally, a satisfaction clause will be upheld . . . ." (citations omitted)). As an escrow agent, Moody Title had to exercise this discretion in a manner consistent with its fiduciary duties. *See Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 733 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Meyer v.*

16

*Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005), and clarifying that an escrow agent's fiduciary duties arise as a matter of law).

Street explained at trial why she did not accept the cashier's check but instead required wired funds. She testified that her underwriter instructed her not to accept the check and that failure to comply with these instructions would have placed her escrow officer's license at risk.

Apart from her underwriter's instructions, Street explained that she needed the purchase price to be delivered in collected funds, funds that were immediately available for transfer to the seller. Unless she could deliver funds to the seller, she could not release the seller's deed and issue a title policy. Moreover, without a title policy, Street claimed that Capcor's bank would not allow its escrowed money to be released to pay the portion of the purchase price Capcor was borrowing.

Substantiating her account of her actions, Street explained that she could not have deposited Capcor's cashier's check at the late hour she received it and that in any event, cashier's checks are subject to a three-day hold. Finally, she explained that using Moody Title's own funds in lieu of the delayed proceeds of the cashier's check was not possible given the proper role of an escrow agent and in light of Moody Title's limited resources.

The reasons that Street furnished for requiring wired funds were corroborated in multiple respects by Brett Moody's testimony. He testified that, in

17

practice, a title company would never release a seller's deed until it had delivered the purchase price to the seller, that a lender providing financing for a purchaser would always instruct the title company not to release its funds until a title policy was in place, and that funds drawn by a cashier's check are subject to an initial hold that keeps them from being accessible for immediate distribution.

Capcor, in its attempt to show that the evidence conclusively demonstrates a breach, relies upon record evidence that Brett Moody was reluctant to sell the property, that he had received better offers for the property, that he owned Moody Title, and that he, in Street's words, "may have" told Street that he did not want to close the deal if wired funds were not timely received. Relying on this evidence, Capcor argues, "One might infer that Street did not disclose these facts because her boss wanted the deal to fall through." Even if that inference were possible, it was implicitly rejected by the jury, which may have instead credited Street's testimony that she was "absolutely" independent when acting as an escrow agent, as well as her description of the procedures she uses to segregate her affairs from other Moody businesses so as to comply with Texas law.

Under the applicable standard of review, the jury is entitled to resolve conflicts in the evidence unless its conclusions are so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See City of Keller*, 168 S.W.3d at 820–21; *Dow Chem. Co.*, 46 S.W.3d at 242. The adverse

18

inferences advocated on appeal by Capcor were rejected by the jury. The testimony of Street and Moody would have permitted a reasonable jury to conclude that Moody Title required wired funds from Capcor in good faith, in a permissible exercise of its business judgment, and with valid, neutral reasons.

Capcor's claim that the great weight and preponderance of the evidence showed that mandating payment by wire transfer violated Moody Title's fiduciary duties and represented tortious inference with the contract is thus overruled.

## II.     Breach of contract claim against Capcor

Capcor argues that the trial court erred by refusing its proposed jury instruction on material breach of the contract, because there was evidence at trial to support a finding that its failure to deliver good funds acceptable to Moody Title on the day of closing was not a material breach.

A trial court's decision to submit or refuse a particular instruction is reviewed under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam). If an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009).

We conclude that the rejected instruction would not have been relevant to the jury's conclusions. The contract states that "[i]f either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15." Moody Kirby's remedies in Paragraph 15 included "terminat[ing] the contract and receiv[ing] the earnest money as liquidated damages."

It is black-letter contract law that "when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). Timely performance may be a material term: "if it is clear the parties intend that time is of the essence to a contract, timely performance is essential to a party's right to require performance by the other party." *Id.* However, time is not ordinarily of the essence. *Kennedy Ship & Repair, L.P. v. Pham*, 210 S.W.3d 11, 19 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The mere fact that a contract states a date for performance does not imply that time is of the essence. *Id.* Rather, "the contract must expressly make time of the essence or there must be something in the nature or purpose of the contract . . . making it apparent that the parties intended that time be of the essence." *Id.*; *accord Deep Nines, Inc. v. McAfee, Inc.*, 246 S.W.3d 842, 846 (Tex. App.—Dallas 2008, no pet.). "In other words, the parties' contract may make time essential without

20

including the magic words 'time is of the essence.'" 2 MILTON R. FRIEDMAN & JAMES CHARLES SMITH, FRIEDMAN ON CONTRACTS AND CONVEYANCES OF REAL PROPERTY § 7:3.2 (7th ed. 2005).

A finding that time is of the essence "is particularly likely when the provision consists of a right to cancel the contract." *Id.* "Contracts often contain language making one party's performance by a specified date a condition of the other party's duty, and courts will usually honor such language if it is clear." E. ALLAN FARNSWORTH, CONTRACTS § 8.18, at 573–74 (4th ed. 2004). For example, in *Mailloux v. Dickey*, 523 A.2d 66 (N.H. 1986), the Supreme Court of New Hampshire interpreted a real estate sales contract that "contained a clause indicating the agreement would terminate upon the failure of the parties to close the transaction" by the date specified. 523 A.2d at 67. It held that the termination clause was "even more specific" than use of the phrase "time is of the essence" and entitled the defendant to terminate the contract when the transaction did not close by the named date. *Id.* at 69.

Closer to home, the Amarillo Court of Appeals reached a comparable result in *Limestone Group, Inc. v. Sai Thong, L.L.C.*, 107 S.W.3d 793 (Tex. App.— Amarillo 2003, no pet.). In that case, the parties entered an agreement to convey a tract of land. *Limestone Grp.*, 107 S.W.3d at 795. When the parties were unable to consummate the deal, Limestone sued for specific performance. *Id.* Sai Thong

21

argued that Limestone was not entitled to specific performance because it was in default, having failed to pay $75,000 in earnest money on a date specified in the contract. *Id.* Limestone argued that its failure to pay the earnest money should only preclude the remedy of specific performance if that failure amounted to a material breach of the contract. *Id.* at 796–97.

The court of appeals recognized the general principle that "only a material breach prevents one from pursuing specific performance." *Id.* (citing *Hudson v. Wakefield*, 645 S.W.2d 427 (Tex. 1983), and *Cowman v. Allen Monuments, Inc.*, 500 S.W.2d 223 (Tex. Civ. App.—Texarkana 1973, no writ)). However, it found that principle inapplicable to the case before it because the contract contained a "provision [that] expressly addresses Limestone's right to specific performance." *Id.* at 796. In order for Limestone to pursue specific performance, the contract required that Limestone, "not be in default." *Id.* The court stressed that the parties only used the word "default" and did not attach "words of qualification or measure to it, such as substantial or material." *Id.* at 797.

Having examined the language of the contract, the Amarillo court concluded that Limestone could not obtain specific performance regardless of the materiality of its breach. It relied on two well-established principles of Texas contract law: (1) "parties to an agreement may contractually specify the remedies available . . . and, thereby, modify the legal and equitable remedies generally applicable," *id.*

22

(citing *GT & MC, Inc. v. Tex. City Ref., Inc.*, 822 S.W.2d 252, 256 (Tex. App.—Houston [1st Dist.] 1991, writ denied)); and (2) language in a contract must ordinarily be afforded its plain, everyday meaning, *id.* (citing *Tex. City Ref.*, 822 S.W.2d at 256).

As a matter of contractual terms, just as Limestone's default unequivocally barred it from seeking specific performance, Capcor's failure to deliver good funds acceptable to the escrow agent by the last day the contract fixed for closing unequivocally permitted Moody Kirby to terminate the contract and obtain the earnest money. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law."); *Weaver v. Jamar*, 383 S.W.3d 805, 812 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Parties to a contract are free to limit or modify the remedies available for breach of their agreement."); *Limestone Grp.*, 107 S.W.3d at 797 ("[B]ecause the plain meaning of the word ["default"] connotes a mere failure, omission, or breach . . . . we eschew attempt to affix words of qualification or measure to it, such as substantial or material." (footnote omitted)).

Capcor's argument assumes the following scenario: If the jury had received the rejected instruction, it could have found that Capcor's failure to deliver the full purchase price by wire on the day of closing was not a material breach. The jury

23

then could have found that Moody Kirby, by giving notice the next day that it was terminating the contract, was the first party to materially breach. If that were the case, Capcor contends that its failure to authorize disbursement of the earnest money would be excused by prior material breach.

The contract, however, affirmatively bestowed upon Moody Kirby the right to terminate if Capcor defaulted by failing to timely deliver good funds acceptable to the escrow agent. Whether or not Capcor's breach would otherwise be considered material is irrelevant to the outcome of the case. *Cf. Limestone Grp.*, 107 S.W.3d at 796–97 (whether plaintiff's breach of real estate sales contract was material was irrelevant to whether plaintiff could obtain specific performance when terms of contract disqualified a breaching party from obtaining that remedy). It is enough for us to say that if Capcor failed to close, then Moody Kirby had the right to terminate. The trial court did not err in refusing the proposed instruction; Capcor's issue is overruled.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Massengale and Huddle.

24