**Opinion issued November 20, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00952-CV

———————————

**IQ HOLDINGS, INC., Appellant**

**V.**

**STEWART TITLE GUARANTY COMPANY AND STEWART TITLE COMPANY F/K/A STEWART TITLE COMPANY OF HOUSTON, Appellees**

---

On Appeal from the 281st District Court
Harris County, Texas
Trial Court Case No. 2012-09859

---

### O P I N I O N

In this real estate dispute, IQ Holdings, Inc. sued its title insurer and its escrow agent to recover damages it sustained in connection with the sale of a condominium unit. During pre–trial discovery, IQ also sought a spoliation–of–

evidence finding and sanctions against both defendants. The trial court denied IQ's motions for spoliation sanctions and for partial summary judgment. The court granted summary judgment to the defendants, Stewart Title Guaranty Company (STGC) and Stewart Title Company (STC).

On appeal, IQ contends that (1) STGC and STC destroyed and fabricated evidence; (2) STGC breached its title insurance policy contract; (3) STC owed a duty to IQ to ensure good title and disclose that a waiver of the condominium Association's right of first refusal was inadequate; (4) STC was negligent in closing the transaction; and (5) STGC is vicariously liable for STC's negligence. Finding no error, we affirm.

## Background

On October 19, 2006, in a residential condominium contract, David Barnard agreed to sell Unit 264 of the Villa d'Este Condominiums to IQ for $3 million. Like all Texas condominiums, Villa d'Este was created by recording a declaration in the county's real property records pursuant to the Texas Uniform Condominium Act. *See* TEX. PROP. CODE ANN. § 82.051 (West 2014).

In the condominium contract, Barnard agreed to provide IQ with copies of the resale certificate, the condominium declaration, and the condominium

Association's by–laws and rules within five days.[1]  The contract made was subject to the buyer's cancellation by the sixth day after receipt of those documents.

The first page of the sales contract names IQ as the buyer.  The record contains two copies of the last page, both executed on October 19.  One copy shows Yohanne Gupta's signature above text naming "YOHANNE GUPTA AND OR ASSIGNS" as the buyer.  On the second, Linda Haynes Gupta signed above text naming "IQ HOLDINGS, INC." as the buyer.  The contract names Stewart Title as escrow agent.  Both are also signed by Barnard, the seller.

As the escrow agent, STC accepted a $100,000 check in earnest money, drawn on an IQ account and signed by Yohanne Gupta.  Parker Witt, an STC employee, oversaw the transaction.

STGC, the title insurer, provided an insurance policy that covered title risks to the property, subject to express exceptions.  Among those, in Schedule B of the contract, STGC excepts: "Restrictive Covenants . . . set out in the Declaration for Villa d'Este, recorded in Film Code No. 173042 of the Condominium Records of Harris County, Texas."  STGC further excepts: "Terms and Conditions of the Declaration for Villa d'Este, recorded in Film Code No. 173042 of the Condominium Records of Harris County, Texas."

---

[1]  The Uniform Condominium Act, as adopted by the Texas Legislature, requires a condominium unit owner to furnish the purchaser with a current copy of the declaration, bylaws, and any condominium association rules before executing a contract for sale.  TEX. PROP. CODE ANN. § 82.157(a)(1) (West 2014).

In its recorded Declaration, Villa d'Este grants the condominium's Owners' Association a right of first refusal in connection with the prospective re–sale of any condominium. On October 20, 2006, the Association provided a letter waiving its right of first refusal as to a sale between Barnard and Yohanne Gupta. The record does not reveal whether the Association disclosed information required by the sales contract and section 82.157 of the Texas Property Code or whether, before closing, Barnard provided the Guptas with copies of Villa d'Este's Declaration, by–laws, and Association rules.[2] At the closing, Witt noticed that the Association's waiver of its right of first refusal named Gupta but not IQ. Witt nonetheless closed the transaction without reporting it.

*Denial of claim*

Almost four years later, in August 2010, in a suit between IQ and the Villa d'Este Condominium Association, the Association posited that it had never consented to the October 2006 conveyance from Barnard to IQ.[3] The Association, however, did not challenge the validity of Barnard's 2006 sale to IQ. Rather, it

---

[2]  Chief among these in this appeal, section 82.157 required the Association to provide the prospective buyer with statements of "any right of first refusal or other restraint contained in the declaration that restricts the right to transfer a unit . . . ." TEX. PROP. CODE ANN. § 82.157(a)(1).

[3]  That dispute was resolved through arbitration. *See IQ Holdings, Inc. v. Villa d'Este Condo. Owner's Ass'n, Inc.*, No. 01-11-00914-CV, 2014 WL 982844 (Tex. App.—Houston [1st Dist.] Mar. 3, 2014, no pet.) (affirming confirmation of arbitration award).

challenged IQ's later conveyance to Saroj Gupta and Yohanne Gupta in February 2009.

After filing suit, IQ's counsel notified Victor Davis, STGC's claims counsel, of IQ's litigation with the Association. IQ's counsel asserted that it should cover IQ's title risk and should indemnify it for attorney's fees, costs, and expenses incurred in the suit with the Association. Davis denied IQ's claim for two reasons: (1) the title insurance coverage expressly excepted the restrictions set forth in the Declaration, including the right of first refusal; and (2) the Association challenged the February 2009 sale from IQ to the Guptas, not the October 2006 sale from Barnard to IQ covered by the policy. Davis notified IQ of its right to contest his denial of its claim through litigation.

In the present suit, Davis averred that he denies about 40 title insurance claims per year, and less than five percent of them result in litigation. He also averred that IQ's claim was a "clear cut exception" to the title insurance policy that he did not believe was likely to result in litigation at the time he denied it.

*STC's document retention policy*

After Davis reviewed the claim, STC "stripped, scanned, and destroyed" its hard–copy closing file. According to STC's ordinary course of business, its employees electronically preserved "all the pertinent data" in a system called FileStor. IQ contended in the trial court that STC did not preserve all of the hard-

copy documents in the FileStor system. At the time, however, STC also used another electronic file retention system called SureClose. STC represented to the trial court that it had preserved all of the documents pertaining to the 2006 transaction in the SureClose system.

*Course of proceedings*

In February 2012, IQ sued STGC and STC for breach of contract, breach of fiduciary duty, and negligence, among other claims, to recover damages arising from its suit with the Association. STGC and STC moved for summary judgment on traditional and no–evidence grounds. IQ moved for partial summary judgment on its breach–of–fiduciary–duty claim against STC. IQ also sought sanctions against STGC and STC in connection with the destruction of the hard–copy closing file. The trial court denied IQ's motion for sanctions. The trial court granted STGC and STC's motions.

## Discussion

## I. Spoliation of Evidence

### A. *Standard of review*

We review the trial court's legal determination of whether a party spoliated evidence for an abuse of discretion. *See Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or

6

principles. *Miner Dederick Constr., LLP v. Gulf Chem. & Metallurgical Corp.*, 403 S.W.3d 451, 465 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *Clark v. Randall's Food*, 317 S.W.3d 351, 356 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A trial court does not abuse its discretion when it bases its decisions on conflicting evidence, but a trial court has no discretion in determining what the law is or in applying the law to the undisputed facts. *Miner Dederick*, 403 S.W.3d at 465; *Clark*, 317 S.W.3d at 356. If the trial court's summary–judgment ruling rests on an erroneous spoliation finding, then we must reverse. *Clark*, 317 S.W.3d at 356.

### B.    Duty to preserve

"[T]the party seeking a remedy for spoliation must demonstrate that the other party breached its duty to preserve material and relevant evidence." *Brookshire Bros.*, 438 S.W.3d at 20 (citing *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003)). A duty to preserve evidence exists when (1) a party knows or reasonably should know that there is a substantial chance a claim will be filed; and (2) the evidence is relevant and material. *Id.*; *Miner Dederick*, 403 S.W.3d at 465.

A party reasonably should know that a substantial chance of a claim against it exists if a reasonable person would conclude from the severity of the incident, and other circumstances surrounding it, that there was a substantial chance for

litigation when the alleged spoliation occurred. *Brookshire Bros.*, 438 S.W.3d at 20 (citing *Wal–Mart*, 106 S.W.3d at 722); *Miner Dederick*, 403 S.W.3d at 465. "[A] 'substantial chance of litigation' arises when 'litigation is more than merely an abstract possibility or unwarranted fear.'" *Brookshire Bros.*, 438 S.W.3d at 20 (quoting *Nat'l Tank Co. v. Brotherton*, 851 S.W.2d 193, 204 (Tex. 1993)). A party can anticipate litigation before it receives actual notice of potential litigation. *Clark*, 317 S.W.3d at 357; *accord Brookshire Bros.*, 438 S.W.3d at 20.

A party must preserve material evidence reasonably calculated to lead to the discovery of admissible evidence. *Miner Dederick*, 403 S.W.3d at 466; *Clark*, 317 S.W.3d at 357. The party seeking a spoliation sanction thus must also demonstrate that the alleged spoliator knew or reasonably should have known that the evidence would be relevant to a lawsuit. *Miner Dederick*, 403 S.W.3d at 466; *Clark*, 317 S.W.3d at 357.

Pointing to the relatively few claims denials that result in litigation each year, STGC and STC argue that Davis believed that no substantial chance existed that IQ would file suit. But Davis's subjective belief does not relieve STGC and STC of their duty to preserve evidence; we apply an objective standard in making this determination. *See Brookshire Bros.*, 438 S.W.3d at 20 (applying "reasonable person" standard to duty determination). Given Davis's repeated correspondence with IQ's counsel and Davis's knowledge of IQ's suit with the Association, Davis

8

should have known that there was a substantial chance IQ would file suit. The Insurance Code also requires evidence of a title insurance policy or contract to be preserved in a title insurance company's files for at least 15 years after the date of issuance of the policy or contract. TEX. INS. CODE ANN. § 2704.001(4) (West 2009). Because the documents in the closing file were at least potentially relevant to IQ's claims against STGC and STC, we hold that Davis had a duty to preserve them. *See Miner Dederick*, 403 S.W.3d at 466; *Clark*, 317 S.W.3d at 357.

## C.    Breach

"If a party possesses a duty to preserve evidence, it is inherent that a party breaches that duty by failing to exercise reasonable care to do so." *Brookshire Bros.*, 438 S.W.3d at 20. Here, the hard–copy closing file itself was destroyed, but STC electronically preserved closing files in two different storage systems. Ed Lester, STC's corporate representative, testified that under the company's records retention policy, its employees stripped the hard–copy closing file and electronically preserved "all the pertinent data" in a system called FileStor. It is unclear from the record if all of the documents were electronically preserved in the FileStor system. Davis testified that "it may be that nothing was removed," but IQ observes that Davis wrote in an email to IQ: "No Title Commitment remains in the file."

Davis did not know to look anywhere other than the Filestor system. At the hearing in the trial court, Lester explained that STC also uses SureClose, another electronic file retention system. According to Lester, an escrow officer typically scans every document related to the transaction into the SureClose system at or near the time of the closing and provides the parties with online access information. Lester testified the documents pertaining to the 2006 transaction were preserved in the SureClose system.

IQ alleges that STGC and STC destroyed the title commitment letter. But STGC and STC produced a copy of the title commitment that had been preserved in the SureClose system. IQ responds that STGC and STC fabricated that copy in 2013 after destroying the real letter, because the document they produced (1) lists a nonsensical date and (2) has a "fraudulent" signature.

First, the title commitment cover letter lists an issuance date of October 24, 2005, whereas the effective date of the commitment is October 9, 2006. Lester conceded that the issuance date is incorrect, but he explained that the discrepancy resulted from a typographical error that occurred during data entry and caused the date field to generate a 2005 date instead of the correct date—October 24, 2006. Lester testified that the title commitment letter is issued on the date the actual title examination is completed, typically ten to fifteen days after the effective date of

the commitment. The trial court reasonably could have accepted this explanation for the inconsistencies between the dates.

Second, the title commitment that STGC and STC produced is signed by Malcolm Morris, as STGC's president. According to IQ, a genuine copy of the title commitment would have been signed by Michael Skalka, as STGC's president, pointing to a copy of the title policy signed by Skalka. But the record also contains a different copy of the title policy—one originally provided by IQ with its claims notice—that was signed by Morris. IQ does not allege that this copy of the title policy has been fabricated. Because the signature on the title commitment matches the signature on the title policy that IQ produced, the trial court reasonably could have found that Morris's signature on the title commitment was not fraudulent, but genuine.

IQ also contends that STGC and STC may have destroyed other documents unavailable to it because STC destroyed the hard–copy file. Lester, however, testified that, to the best of his knowledge, all the documents pertaining to the 2006 transaction were preserved in the SureClose system. The trial court could have credited this testimony, believed that STC had electronically stored the closing file, and thus reasonably could have determined that STGC and STC did not breach

their duty to preserve.[4]  Accordingly, we hold that the trial court acted within its discretion in denying IQ's motion for sanctions.  *See Miner Dederick*, 403 S.W.3d at 465; *Clark*, 317 S.W.3d at 356.

## II.    Summary Judgment

### A.    *Standard of review*

We review a trial court's decision to grant or to deny a motion for summary judgment de novo.  *GCI GP, LLC v. Stewart Title Guar. Co.*, 290 S.W.3d 287, 291 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2008)).  Although a denial of summary judgment is not normally reviewable, we may review such a denial when both parties move for summary judgment and the trial court grants one motion and denies the other.  *Id.*  In our review of such cross–motions, we review the summary–judgment evidence presented by each party, determine all questions presented, and render the judgment that the trial court should have rendered.  *Id.* (citing *Tex. Mun. Power Agency*, 253 S.W.3d at 192).

### B.    *Breach of contract*

IQ contends that STGC breached the title insurance policy agreement.  We construe an insurance policy according to the rules of contract construction.  *See*

---

[4]  Applying *Brookshire Brothers v. Aldridge*, the existence of these electronic records also supports a finding that IQ did not suffer any prejudice from the destruction of the hard-copy files.  *See* 438 S.W.3d 9, 21 (Tex. 2014).

12

*Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Our primary concern in interpreting a policy is to ascertain and to give effect to the parties' intentions as expressed in the document. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). We construe contracts to avoid a construction that is unreasonable, inequitable, or oppressive. *Frost Nat'l Bank*, 165 S.W.3d at 312. If, after applying the pertinent rules of construction, the policy has a definite legal meaning, then it is unambiguous, and we construe it as a matter of law. *Id.*; *Schaefer*, 124 S.W.3d at 157. If, in contrast, after applying the rules of construction, a contract term is ambiguous, we construe it in favor of the insured. *See Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006); *Archon Invs., Inc. v. Great Am. Lloyds Ins. Co.*, 174 S.W.3d 334, 338 (Tex. App.— Houston [1st Dist.] 2005, pet denied).

The cover page of the title insurance policy issued to IQ explains that the policy covers title risks "subject to the Exceptions (p. 4)." Under Schedule B on page 4, the policy excepts: "Restrictive Covenants . . . set out in the Declaration for Villa d'Este, recorded in Film Code No. 173042 of the Condominium Records of Harris County, Texas." The policy also excepts: "Terms and Conditions of the [Declaration]." The policy's unambiguous language excepts title risks arising from

the Declaration. Article IX of the Declaration gives the Association the right of first refusal to purchase any condominium.

IQ directs our attention to *GCI GP*, in which we addressed a title insurance policy coverage dispute involving mechanic's liens that allegedly predated the issuance of the title policy. 290 S.W.3d at 289. The trial court had granted summary judgment in favor of the title insurer based on the policy's provision excluding "removables." On appeal, this Court addressed the interplay between that exclusion and the policy's coverage for losses or damages caused by the "'[l]ack of the priority of the lien of the insured mortgage over any statutory mechanic's lien having its inception on or before the [d]ate of [p]olicy.'" *Id.* at 291, 293. The Court considered the statutory backdrop for mechanic's liens, observing that a "mechanic's lien may only attach to land and items that have become annexed to land, such as improvements (including fixtures), not to chattel." *Id.* at 295 (citing, inter alia, TEX. PROP. CODE ANN. § 53.022 (West 2014)). But, the Court noted, "chattels that have been incorporated into the realty become 'fixtures' and are subject to a statutory mechanic's lien." *Id. GCI GP* held that the lien attached to improvements made by the lienholder "that could be removed without material injury to the land and pre–existing improvements or to the improvements themselves," and thus, could not be excluded from coverage pursuant to the "removables" provision. *Id.* at 296. As a result, we reversed the

14

summary judgment in favor of Stewart Title and remanded the case for further proceedings. *Id.* at 297.

Unlike the mechanic's–lien statute's effect on the policy language in *GCI GP*, the statutory backdrop applicable to condominium declarations does not detract from the clarity of the policy's exception of the restrictions set forth in Villa d'Este's Declaration. The Texas Property Code requires the condominium unit owner to provide a prospective buyer with a current copy of the declaration before contracting to convey the unit and provide a resale certificate that specifically addresses whether the declaration contains a right of first refusal or other restraint that restricts the right to transfer. TEX. PROP. CODE ANN. § 82.157. Thus, we reject IQ's assertion that *GCI GP* supports reversal of the trial court's summary judgment.

IQ further complains that STGC's reference in the policy to the Declaration is general; rather, IQ contends, the contract should have included specific language excepting the Association's right of first refusal. In *Southwest Title Insurance Co. v. Northland Building Corp.*, the Texas Supreme Court rejected a similar complaint. 552 S.W.2d 425, 429 (Tex. 1977). It held "[t]here is no question but that a title insurance company may provide for an exception from its coverage by reference to the provisions of an instrument without setting forth in detail the content of those provisions." *Id.* Here, the policy's reference to the Declaration

15

effectively excepts all title risks arising from that instrument, including title risks arising from the Association's right of first refusal. *See id.* Under Texas law and the condominium contract, IQ should have received from the seller a copy of the Declaration and the Association's waiver of its right of first refusal before closing; it had the right to terminate the sale contract if it did not.

Read together with the applicable law, the policy's exception has a definite legal meaning, putting the prospective buyer on notice that it excepts coverage for any right–of–first–refusal restriction. STGC had no independent obligation to recite the Declaration's restraints on sale in order to except them from insurance coverage. Accordingly, we hold that the trial court did not err in granting summary judgment to STGC on IQ's breach–of–contract claim.

### C.    *Breach of fiduciary duty*

IQ's claim against STC as its escrow agent and as STGC's title insurance agent is that STC owed it a duty to ensure that IQ received good title at closing; it claims that STC breached its fiduciary duty to IQ by failing to obtain a proper waiver of the right–of–first–refusal covenant on IQ's behalf. Whether a fiduciary duty exists is a question of law. *Dernick Res., Inc. v. Wilstein*, 312 S.W.3d 864, 877 (Tex. App.—Houston [1st Dist.] 2009, no pet.)).

As STGC's agent, STC owed no duty to IQ to obtain good title. A title insurance policy is an indemnity contract; the only duty it imposes is the duty to

16

indemnify the insured against losses caused by defects in title which are not excepted by the policy. *Hahn v. Love*, 394 S.W.3d 14, 35 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). STC's title investigation inured to its principal's benefit, not to IQ: "[a]lthough the insurer must examine the title (or have someone do so in its behalf), this investigation is done for the insurer's own information in order to determine whether or not it will commit itself to issue a policy. The investigation is not done for the benefit of the party insured." *Stewart Title Co. v. Cheatham*, 764 S.W.2d 315, 320 (Tex. App.—Texarkana 1988, writ denied). A title insurance company is not a title abstractor and owes no duty to examine a title or point out any outstanding encumbrances. *Hahn*, 394 S.W.3d at 25 (citing *Tamburine v. Ctr. Sav. Ass'n*, 583 S.W.2d 942, 947 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.)); *Martinka v. Commw. Land Title Ins. Co.*, 836 S.W.2d 773, 777 (Tex. App.—Houston [1st Dist.] 1992, writ denied). STC did not assume an obligation beyond STGC's contractual one as indemnitor in connection with its role as the agent for the title insurer.

A title insurance company assumes a fiduciary duty to both parties when it acts as an escrow agent in a transaction. *See Capcor at KirbyMain, L.L.C. v. Moody Nat'l Kirby Houston S., L.L.C.*, No. 01-13-00068-CV, 2014 WL 982858, at *3 (Tex. App.—Houston [1st Dist.] Mar. 13, 2014, no pet.) (mem. op.). These fiduciary duties consist of: (1) the duty of loyalty; (2) the duty to make full

17

disclosure; and (3) the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it. *Id.* (citing *Trevino v. Brookhill Capital Res., Inc.*, 782 S.W.2d 279, 281 (Tex. App.—Houston [1st Dist.] 1989, writ denied)).

When acting as an escrow agent, however, the title company's authority is limited to the closing of the transaction; it does not extend to an investigation of title. *Tamburine*, 583 S.W.2d at 949; *see Holder–McDonald v. Chicago Title Ins. Co.*, 188 S.W.3d 244, 248 (Tex. App.—Dallas, 2006, pet. denied) (observing that title insurance company's fiduciary duties are strictly limited to role as escrow agent); *see generally Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 733 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (explaining that fiduciary's duties do not extend beyond scope of fiduciary relationship) (citing *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159–60 (Tex. 2004)).

In *Holder–McDonald*, the Dallas Court of Appeals held that a title insurance company was not liable when it prepared an affidavit that contained an incorrect legal description of the land. *Id.* at 249. The court explained that no breach of duty occurred because the agent prepared the incorrect affidavit in connection with its role as agent for the title insurer and not as part of its duties as escrow agent. *Id.* The *Holder–McDonald* court cautioned against unwarranted expansion of an escrow agent's duties, warning that conflating a title insurance company's

contractual obligation to indemnify the insured with an escrow agent's fiduciary duties would cause the escrow agent to "become a second title insurer with unlimited liability." *Id.* at 248.

We follow *Holder-McDonald*'s reasoning. Witt, an STC employee, served as an escrow agent and oversaw the signing and recording of conveyance documents at closing. IQ and Barnard agreed that IQ would deposit $100,000 as earnest money with Witt as escrow agent. Like the escrow agent in *Holder-Donald*, Witt complied with his escrow agent duties—IQ does not challenge that the earnest money was properly accounted for, and the transaction closed.

Instead, IQ seeks to impose liability against the escrow agent for failing to disclose the limitations of the Association's waiver of the right of first refusal, and proceeding to close the transaction even with the waiver's purported deficiencies. Along those lines, IQ adduced testimony from STC's employees that STC owed IQ a duty to ensure that IQ received good title at closing. But that duty was found on the written title insurance policy and is limited by its exceptions. IQ and STC did not form a written contract that explained or expanded Witt's duties as escrow agent and closer. Because "good title" was limited to that which the policy protected, IQ's fiduciary duty claim is unsupported by the underlying facts. *See Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st Dist.] 1997, no pet.).

IQ misplaces its reliance on *Home Loan Corp. v. Texas American Title Co.* There, our sister court of appeals held that an escrow agent had a duty to disclose to a mortgage loan funder that the seller had requested half of its proceeds to be paid to a mortgage loan broker. 191 S.W.3d at 734. As an escrow agent, Witt owed IQ a duty of full disclosure. *See Capcor at KirbyMain, L.L.C.*, 2014 WL 982858, at *3. Witt's duty to disclose, however, did not extend beyond the scope of his duties relating to the management of the earnest money. *See Home Loan Corp.*, 191 S.W.3d at 733. Unlike IQ's allegations against Witt in this case, the escrow agent in *Home Loan* breached a duty of disclosure in a matter relating to the escrow agent's disbursement of funds. *Id.* at 730. In contrast, IQ's complaint relates to the nondisclosure of an excepted title defect, which does not fall within the scope of the escrow agent's fiduciary obligations. *See Holder–McDonald*, 188 S.W.3d at 248; *Tamburine*, 583 S.W.2d at 949.

IQ further cites to STC's failure to follow its internal guidelines in failing to flag the difference between the waiver and the sales contract as support for its breach–of–fiduciary–duty claim. Internal guidelines, however, do not create any benefit in favor of IQ. *See, e.g., White v. Mellon Mortg. Co.*, 995 S.W.2d 795, 802–03 (Tex. App.—Tyler 1999, no pet.) (holding that servicing guidelines between insurer and bank did not create benefit entitling appellant to automatic cancellation of mortgage guaranty insurance). The guidelines refer to STC's role

20

as insurance agent in issuing a title insurance policy, not to its conduct in acting as an escrow agent. Accordingly, we hold that the trial court properly granted STC summary judgment on IQ's breach–of–fiduciary–duty claim.

### D.    Negligence

Finally, IQ complains that STC was negligent in failing to obtain good title for IQ and in failing to disclose the defect in the Association's waiver letter. IQ further contends that STGC is vicariously liable for STC's negligence, because STC was its insurance agent. In a negligence case, the threshold inquiry is whether the defendant owes a legal duty to the plaintiff. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014). STC did not owe a legal duty to IQ to provide it with title coverage beyond the scope of the written policy or to disclose risks that the policy did not cover. Accordingly, it cannot be held liable under a negligence theory. *See Holder–McDonald*, 188 S.W.3d at 248; *Tamburine*, 583 S.W.2d at 949; *Boerjan*, 436 S.W.3d at 310.

In response, IQ relies on *Dixon v. Shirley* to contend that STC had a duty to disclose the defect in the waiver. 558 S.W.2d 112 (Tex. App.—Corpus Christi, 1977, writ ref'd n.r.e.). In *Dixon*, the parties to a real–estate contract instructed a title insurance company to issue a title policy for a lot. *Id.* at 116. After discovering a title defect in the south half of the lot, the title insurance company prepared a warranty deed for the north half of the lot only and issued a policy

21

covering only that half. *Id.* at 114, 117. The title insurance company did not inform the parties of this limitation; rather, it erroneously told the parties that the title policy conformed to their contract. *Id.* at 114. The court of appeals held that "[a] title company cannot close its eyes to known irregularities or discrepancies between its title policy and the order for the title policy." *Id.* at 117.

The facts here are inapposite. Unlike the title policy in *Dixon,* STC's policy covered the property described in the contract and expressly excluded title risks stemming from the terms and conditions set forth in the Association's Declaration, including any obligation to comply with its right–of–first–refusal restriction. As the court of appeals in *Dixon* acknowledged, generally "a title insurance company has no duty to examine title and to apprise the insured of any defects found therein." *Id.* at 116. The Uniform Condominium Act, the Texas enactment of which postdates *Dixon*, affirmatively requires the seller of a condominium unit to provide the buyer with a copy of the condominium association's declaration and a resale certificate that includes "any right of first refusal or other restraint contained in the declaration that restricts the right to transfer a unit." TEX. PROP. CODE ANN. § 82.157(a)(1). We interpret this provision as giving the condominium unit's seller, in the first instance, the duty to inform the prospective buyer of transfer restrictions imposed by the condominium association. No evidence shows that STC assumed an independent duty to disclose title defects beyond those covered

22

by the policy or, like the company in *Dixon*, that STC affirmatively misrepresented the extent of its title coverage.

IQ's reliance on *Zimmerman v. First Am. Title Ins. Co.*, 790 S.W.2d 690 (Tex. App.—Tyler 1990, writ denied), is similarly misplaced. There, the parties to a real estate contract instructed a title insurance company to convey a lot "free and clear of liens" to a real estate agent, in payment of a commission owed. *Id.* at 695. The title insurance company disregarded these instructions and created a lien on the lot without notifying the parties. *Id.* In contrast, IQ did not instruct STC to obtain an additional waiver as a condition of the closing, and STC did not affirmatively represent that it did. Rather, IQ seeks to expand STC's obligations beyond those that the parties agreed to in the title insurance policy. Because the title policy expressly excepted any obligation to ensure that the sale complied with the Association's deed restrictions, we decline to further expand STC's duties to encompass that obligation. *See Holder–McDonald*, 188 S.W.3d at 248.

Because IQ has not shown that STC is liable for breach of a legal duty that it owed to IQ, we hold that STGC has no vicarious liability. The trial court therefore properly granted summary judgment to STC and STGC on IQ's negligence claim.

## Conclusion

We hold that the trial court did not abuse its discretion in denying a spoliation sanction. Because the trial court properly concluded that IQ's claims against STC and STGC are unavailing as a matter of law, we affirm its judgment.

Jane Bland
Justice

Panel consists of Justices Higley, Bland, and Sharp.